**Shauna SUPRÉ also known as Ralph Spencer, Plaintiff,**

v.

**James G. RICKETTS, Ph.D., Executive Director, Colorado Department of Corrections, L. Dennis Kleinsasser, Ph.D., Robert McGowan, M.D., Robert Warren, Ph.D., and Robert T. Moore, Defendants.**

**Civ. A. No. 82–K–24.**

United States District Court, D. Colorado.

Nov. 13, 1984.

Lawrence J. Schoenwald, Denver, Colo., for plaintiff.

David R. DeMuro, Asst. Atty. Gen., Denver, Colo., for defendants.

## ORDER ON ATTORNEY'S FEES

KANE, District Judge.

The plaintiff has moved for an award of attorney fees, costs and expenses pursuant to, respectively, 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

Section 1988 states that "... In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

The issue is whether the plaintiff was the "prevailing party."

The complaint was filed on January 7, 1982, while the plaintiff was in the custody of the Colorado Department of Corrections. The gravaman of the complaint is that the prison authorities were withholding proper medical treatment for plaintiff's sexual dysphoria. Then an exceedingly effeminate male, the plaintiff was in 23 hour a day protective custody. After spending time in the general population, serving sentences for auto theft and escape, during which the plaintiff was raped an indeterminate number of times, and labeled a "snitch," the plaintiff could no longer safely be kept in the proximity of other prisoners.

A confidential memorandum dated July 1, 1981, written by the Chief of Surgery at the Colorado State Hospital, Dr. T.J. Fogel, contains a concise history of the plaintiff up to that date:

> The patient has made six attempts to emasculate himself over a period of years. He feels that he is a woman though he's in a man's body and that he's had psychiatric evaluation by Dr. Dorn [sic Dorian] at the Colorado State Penitentiary who has felt that he is sane and rational and a transexual. He [plaintiff] attempted to arrange [female] hormonal treatment which apparently was not given for reasons of policy. He would like to have a transexual operation in Trinidad, but the State of Colorado has no provision for this. He has made avowedly six attempts in his life to remove his own testicles, one of which resulted in his being put in the Colorado State Hospital Surgical Ward and he recovered from this attempt. He made at least one attempt to kill himself by hanging which was unsuccessful. On the 29th of June he incised and removed a portion of his scrotum, placed string and rubber bands about the spermatic cords bilaterally and this was found the next day and the constricting bands removed and he was sent to the Surgical Service at Colorado State Hospital with the problem. He stated cateorically that he would not allow any treatment if it did not involve the removal of his testicles. He made this very clear. He was quite rational. He was seen by Dr. Huffaker, the Colorado State Hospital phychiatrist, who in a very clear evaluation felt that he was sane in every regard and a true transexual. He was seen by myself, Dr. Fogel. The wound was as described-completely bare testicles, obviously contaminated and beginning to be infected, an absent portion of the scrotum, at this point good circulation of the testicles, but covered with fibrinous exudate. He was very clear in his statement that he had only the loss of his testicles in mind and that he was purposely forcing the issue and he was quite apologetic for putting me in this position, but he felt he must and that he would not allow any treatment unless it was made clear that he would have his testicles removed. Consultation with Dr. Robert Herrmann, Dr. Haydee Kort, Attorney James Hartley, who represents the patient to some degree, Mr. Tarkington [sic Tarquin J. Bromley] of the Attorney General's office, Jack Ewing of the State Hospital and Dr. Wesley Boucher, Urologist who saw the patient in consultation, has made me reach the conclusion, with a good deal of thought and some difficulty, that the patient, at this point, should have his testicles removed. This is based on the fact that he is not, in anyone's opinion, insane; that he is absolutely determined to have this done and from the psychia-

trist's evaluation, in two instances, that he is a true transexual who is so determined that he has made intelligent efforts to lose his male gonads....

On July 2, 1981, the plaintiff's testicles were surgically removed at the Colorado State Hospital. In September of 1981, John D. Glismann, M.D., a psychiatrist on retainer to the Department of Corrections, recommended that plaintiff receive female hormones and be permitted to "live as a female" while in custody. In February of 1981, Kathleen K. Graze, M.D., a retained endocrinologist trained and experienced in the treatment of transexuals, also recommended estrogen therapy for the plaintiff.

The official response of the defendants to the mutilations, castration, doctors' diagnosis and recommendations, and plaintiff's requests for female hormones was a written policy statement dated April, 1982, which concluded that treatment for gender dysphoria and evaluation of sexual reassignment could not be provided in a penal setting.

A trial on the merits began on January 4, 1982. On the morning of the second day of trial, court was recessed for an hour and a half while the parties attempted to reach a stipulation. Although a full stipulation was not reached, the parties did agree to move jointly for a continuance of the trial to a later date, if necessary. In no other case have I tried as hard to persuade the parties to find a nonjudicial resolution to their controversy. Such effort was unavailing.

I granted the motion for a continuance conditioned on the defendant's respecting the plaintiff's right to treatment with low level doses of female hormones for so long a period as would be in the plaintiff's best interests according to physician of the plaintiff's choice. It was also understood that the committee formed by the Department of Corrections to study the problem of treating incarcerated transexuals would address the specific problems of the plaintiff.

It is important to point out that although the defendants had planned to form the committee of experts even before this lawsuit was filed, it was not until immediately after the aborted trial that the committee held a meeting or made a policy recommendation. In a letter to Drs. Graze and Gadpaille dated January 6, 1983, Richard T. Moore, the Director of Medical Services for the Department of Corrections states that "Although the department still holds with the objection to the treatment outlined in Judge Kane's order, I would like to assure you of our cooperation in carrying out the spirit as well as the letter of the judge's order...." Drs. Graze and Gadpaille were both early proponents of female hormone therapy for the plaintiff whose diagnosis and treatment recommendations had previously been ignored by the Department of Corrections.

The plaintiff contends that but for this lawsuit, neither the enlightened recognition by the defendants of the plaintiff's problem nor the subsequent commutation of the plaintiff's sentence by the Governor of Colorado pursuant to the recommendation of the Governor's Executive Clemency Advisory Board, would have occurred. The defendant contends that changes in the plaintiff's treatment were inevitable and were under consideration by prison officials even before the plaintiff filed this lawsuit. The defendants further contend that "with the possible exception of a temporary order allowing plaintiff to take low levels of female hormones, none of his [sic] claims were ruled upon by this court."

The plaintiff contends that the positive results which have been caused, at least in part by this litigation, include:

1. The court's interim order dated 1/5/83 enabling plaintiff to obtain prescribed medications, including estrogen, through physicians of her own choice;

2. The creation of a panel of experts to make recommendations to the Department of Corrections regarding the treatment of transexuals, including special recommendations regarding the plaintiff;

3. Recommendations by prison officials and staff, subsequent to the plaintiff hav-

ing developed breast tissue as a result of receiving female hormones, that the plaintiff be granted early release;

4. Plaintiff's parole after the parole board reviewed opinions and reports of experts retained by plaintiff and supplied to the parole board by plaintiff's lawyer—parole granted 7/25/83;

5. The 8/24/83 unanimous recommendation of the Executive Clemency Advisory Board to the Governor that plaintiff's sentence be commuted to time served. Plaintiff's counsel had supplied the board with pertinent reports and materials from experts retained in this action by plaintiff;

6. The Governor's August 30, 1983 Executive Order commuting the plaintiff's sentence as recommended by the board.

The plaintiff further notes that before her release, there were no rehabilitative programs available to her due to the extraordinary protective custody measures being taken.

The defendants' contention regarding the commutation of plaintiff's sentence is that although plaintiff's attorney had supplied the Governor's Board with a letter in support of the commutation, the assistant superintendent of the Centennial Correctional Facility had sent letters to the Board on June 9 and July 29 of 1983—before the plaintiff, and therefore "gratuitously."

I find that the plaintiff was the "prevailing party" in the sense contemplated by 42 U.S.C. § 1988 because she was allowed long-sought treatment through my January 5, 1983, interim order, because of the catalytic effect that her suit had on her ultimate release, and because of the common benefit that was precipitated on behalf of similarly situated transexuals.

In *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978), it was stated that "... plaintiffs may be considered 'prevailing parties' for attorney fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Nadeau* has been cited with approval for this proposition in *Hensley v. Eckerhart,*

461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40, 50 (1983).

Once the plaintiff has been determined to have obtained some of the benefits sought in bringing the litigation, the plaintiff should be construed to be the prevailing party as long as the underlying constitutional claim is substantial. *Battle v. Anderson,* 614 F.2d 251, 258 (10th Cir. 1980). The plaintiff has achieved some of the benefits sought. The plaintiff was incarcerated and afflicted with pathology recognized by the established medical community as a serious one with a recognized treatment that was denied the plaintiff by the institution charged with her incarceration and care. Although it would not be reasonable to expect the prison system to finance an expensive sex change operation, minimal treatment was not being administered to the plaintiff; the cost of plaintiff's female hormones was approximately $10 a month. The failure of the prison system to comprehend the bizarre actions of the plaintiff, while understandable, does not minimize either the urgency of plaintiff's need for the treatment or the catalytic effect of this lawsuit in obtaining treatment and release. The prison system's failure to react appropriately also highlights the magnitude of the obstacles that confronted plaintiff's counsel in this case.

To this day I remain convinced that the plaintiff's life was in jeopardy. The record is replete with circumstances I will not mention here which show that the probability of her life being terminated was indeed high. Mr. Lawrence J. Schoenwald's handling of this unusual case was skillful, doggedly persistent, and brave. There are very few, if any, other attorneys in this community who would have undertaken this unusual representation with such skill and compassion.

The defendants further contend that the two tests posed by *Nadeau, supra,* are not met. The two tests require that the plaintiff's lawsuit be both a factual and legal cause of the plaintiff's improved condition. The defendants do admit that the interim order allowing plaintiff to take low levels

of female hormones was "possibly" a factual result of the plaintiff's lawsuit.

The defendants contend, however, that the legal test, which examines whether the defendants' conduct was required by law, is not met. In support of this contention, the defendants focus on the Governor's commutation of the plaintiff's sentence and the recommendation for parole made by the Department of Corrections officers.

This contention fails to take note of the fact that the defendants would not have recommended parole or commutation if the plaintiff had not become such a burdensome management problem at the prison. The September 11, 1984 testimony of Carlos Baca, the assistant superintendent of The Centennial Correctional Facility, revealed that the primary reason he wrote letters to the parole and clemency boards was that the plaintiff's development of female breast tissue resulted in unmanageable difficulties at the prison facility. It is clear that if the plaintiff's need for female hormone treatment had not prevailed legally, as it did, then the unmanageable problems would not have arisen, and the plaintiff's sentence would not have been commuted.

The legislative history of § 1988 clearly supports the award of attorney fees to a plaintiff who is only partially successful. "Such awards are especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues." Senate Rep. No. 94–1011, 5 U.S. Code Cong. & Admin.News, pp. 5908, 5912 (1976).

### THE AWARD AMOUNT

■ The amount of attorney fees the plaintiff receives should be based on the work performed on the issues in which he was successful. *Nadeau, supra,* at 279. Under *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983) I must determine: the number of hours reasonably spent by counsel for the party seeking the fees, *id.* at 553; whether the tasks sought to be charged to the adverse party would normally be billed to a paying client, *id.* at 554 and; in setting a rate of compensation for the hours reasonably expended, what lawyers of comparable skill and experience practicing in this area would charge for their time, *id.* at 555.

■ Mr. Schoenwald's time spent in discussion with Daniel Grove, the Chairman of the Colorado Board of Parole and in preparing the material for The Executive Clemency Board is not time spent on the issues of the case. Therefor I deduct the 2.55 hours so spent from the 181.2 hours billed to this case. I have reviewed the affidavits and contemporaneous time records submitted by Mr. Schoenwald, and, with the exception discussed above, find that Mr. Schoenwald reasonably spent 178.65 hours on the case, that the tasks sought to be charged to the adverse party would normally be billed to a paying client, that to an item they are non-duplicative and related to the issue on which the plaintiff prevailed. Mr. Schoenwald's requested $100 hourly rate times 178.65 hours (181.2 less 2.55) equals $17,865. The $100 hourly rate is less than attorneys with Mr. Schoenwald's experience and comparable skill normally charge. It is clearly reasonable.

IT IS ORDERED that attorney fees in the amount of $17,865 are awarded to plaintiff's attorney. The Clerk of the Court is directed to enter judgment in that amount in favor of Mr. Schoenwald and against the defendants.

IT IS FURTHER ORDERED that plaintiff is awarded costs of $4,600.05, to be paid by the defendants. The Clerk of the Court is directed to enter judgment in that amount.