792 F.2d 958
 Shauna SUPRE, also known as Ralph Spencer, Plaintiff-Appellee,
v.
James G. RICKETTS, Ph.D., Executive Director, Colorado
Department of Corrections, L. Dennis Kleinsasser,
Ph.D., Robert McGowan, M.D., Robert
Warren, Ph.D., and Robert T.
Moore, Defendants-Appellants.
 No. 84-2803.
 United States Court of Appeals,
Tenth Circuit.
 June 2, 1986.
 
 John Daniel Dailey, First Asst. Atty. Gen. (Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., and Richard H. Forman, Sol. Gen., with him on brief), Denver, Colo., for defendants-appellants.
 Lawrence J. Schoenwald, American Civil Liberties Union, Denver, Colo., for plaintiff-appellee.
 Before SEYMOUR, SETH and BALDOCK, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 I. Introduction
 
 1
 Plaintiff-appellee Shauna Supre[1] (plaintiff) is a convicted felon and has been diagnosed as a transsexual. He was in the custody of the Colorado Department of Corrections in January, 1982, when he filed a civil rights action pursuant to 42 U.S.C. Sec. 1983 seeking to obtain what he considered necessary medical treatment for gender dysphoria. The matter went to trial on January 4, 1983, was continued the following day, and the case was ultimately "deemed closed" on January 16, 1984, without judicial resolution. On November 26, 1984, plaintiff was awarded $20,910.05 for attorney's fees and costs, 596 F.Supp. 1532.
 
 
 2
 Defendants-appellants (defendants) appeal the award of attorney's fees and costs, arguing that plaintiff is not entitled to such award because he is not a "prevailing party" as required by 42 U.S.C. Sec. 1988.[2] Their alternative argument is that the award must be reduced because it is excessive. Because we hold that plaintiff is not a prevailing party, defendants' alternative argument is not addressed.
 
 II. The Facts
 
 3
 Plaintiff entered the Colorado Department of Corrections in 1978 for auto theft and escape. Upon his request, plaintiff was transferred to the Utah State Penitentiary in March, 1980, but was returned to the Colorado prison system in August, 1980. Beginning in September, 1980, he was placed voluntarily in protective custody because of his feminine characteristics and because he was known by the prison population as a "snitch" or informant. He remained in protective custody for the remainder of his term in prison.
 
 
 4
 Throughout the remainder of 1980, plaintiff engaged in various forms of mutilation of his sex organs. He requested to be treated with estrogen, a female hormone, but this request was denied. A program of counseling by psychologists and psychiatrists was provided, and plaintiff was advised of the dangers of estrogen treatment. After continued attempts at self-mutilation, plaintiff's testicles became severely injured and were removed surgically by a physician at the Colorado State Hospital in July, 1981.
 
 
 5
 In August, 1981, Dr. Dennis Kleinsasser, Director of Health Services for the Department of Corrections, informed plaintiff that the Department's medical staff had studied his request for estrogen and concluded that such treatment would not be warranted because of the dangers involved and because estrogen treatment was but one aspect of an overall plan of treatment which could not be conducted in a prison setting. Thereafter, plaintiff was examined by Dr. Kathleen K. Graze, an endocrinologist, Dr. John D. Glismann, a psychiatrist, and Dr. Robert N. Alsever, an endocrinologist. Drs. Graze and Glismann recommended estrogen treatment, but Dr. Alsever advised against such treatment. On January 7, 1982, plaintiff filed his civil rights suit. In April, 1982, Dr. Robert McGowan, Director of Medical Services for the Department of Corrections, informed plaintiff that the medical staff determined that the appropriate medical treatment would include testosterone replacement therapy and mental health treatment.
 
 
 6
 Also in April, 1982, the Department of Corrections issued its "Interim Policy Regarding Sexual Reassignment" which precluded "sexual reassignment evaluation and treatment for gender dysphoria." A "Transsexual Policy Development Workshop" was conducted in January, 1983, which resulted in a change in the Department's policy to permit "the full benefit of mental health services and therapies offered by the Department of Corrections." Scope of Services for Treatment of Transsexualism, Colorado Department of Corrections Interim Rule 405-14 (Feb. 18, 1983). Dr. Kleinsasser testified that this new policy would not preclude estrogen therapy. Record at vol. VII, 47.
 
 
 7
 The case went to trial on January 4, 1983, but was continued the following day on plaintiff's motion in order to await the Department of Corrections' establishment of a policy for the treatment of transsexuals. The court issued an interim order which permitted plaintiff to receive low dosages of estrogen. After continued estrogen therapy, plaintiff developed breast tissue.
 
 
 8
 In June, 1983, Carlos Baca, assistant superintendent at Colorado's Centenial Correctional Facility, wrote to the chairman of the Parole Board requesting that plaintiff be paroled to his second sentence so that he would be eligible for commutation of sentence. Mr. Baca pursued this matter because he believed plaintiff to present a difficult management problem. On June 20, 1983, plaintiff made another attempt at self-mutilation of the genital area. On June 25, 1983, plaintiff was paroled, and the Governor of Colorado commuted his sentence on August 30, 1983.
 
 
 9
 On January 16, 1984, an order was entered deeming the case closed. Plaintiff moved for attorney's fees and expenses on February 27, 1984, and in November, 1984, his motion was granted.
 
 III. Standard of Review
 
 10
 A district court's award of attorney's fees generally is subject to an abuse of discretion standard of review on appeal. E.g., J. & J. Anderson, Inc. v. Town of Erie, 767 F.2d 1469, 1472 (10th Cir.1985). Thus, the underlying factual findings are reversible only if clearly erroneous.[3] Fed.R.Civ.P. 52(a). Nevertheless, any statutory interpretation or other legal analysis which provides the basis for the award is reviewable de novo. See generally 5A J. Moore and J. Lucas, Moore's Federal Practice Sec. 52.03 (1985).
 
 
 11
 The Supreme Court has noted the vexatious nature of the distinction between questions of fact and questions of law. Baumgartner v. United States, 322 U.S. 665, 671, 64 S.Ct. 1240, 1243, 88 L.Ed. 1525 (1944). Mixed questions of law and fact are even more troubling for standard of review purposes. A mixed question is present when the facts are admitted or established and the law is undisputed; the sole issue is whether the law applied to the facts satisfies the statutory standard. Pullman-Standard v. Swint, 456 U.S. 273, 289, n. 19, 102 S.Ct. 1781, 1790, n. 19, 72 L.Ed.2d 66 (1982). Where the mixed question involves primarily a factual inquiry, the clearly erroneous standard is appropriate. If, however, the mixed question primarily involves the consideration of legal principles, then a de novo review by the appellate court is appropriate. See, e.g., United States v. McConney, 728 F.2d 1195, 1199-1205 (9th Cir.1984) (en banc) (holding that the mixed question of exigent circumstance is reviewable de novo as a question of law).
 
 
 12
 Most appellate courts that have reviewed a district court's determination of the "prevailing party" issue have independently considered the totality of the circumstances they found in the record. E.g., Gurule v. Wilson, 635 F.2d 782, 791 (10th Cir.1980), as amended, 649 F.2d 754 (1981); J. & J. Anderson, Inc. v. Town of Erie, 767 F.2d 1469 (10th Cir.1985); Hennigan v. Ouachita Parish School Bd., 749 F.2d 1148 (5th Cir.1985); Institutionalized Juveniles v. Sec. of Pub. Wel., 758 F.2d 897, 910-17 (3d Cir.1985); Miami Herald Pub. Co. v. City of Hallandale, 742 F.2d 590 (11th Cir.1984). But see Posada v. Lamb County, Texas, 716 F.2d 1066, 1072 n. 7 (5th Cir.1983). Although most appellate courts conduct a de novo review when presented with the "prevailing party" issue, the standard of review is rarely stated.
 
 
 13
 As already noted, a plaintiff must be a "prevailing party" to recover an attorney's fee under Sec. 1988. A plaintiff may prevail in the absence of a judicial determination or full litigation. Maher v. Gagne, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980). The test for determining whether a plaintiff is a prevailing party when there has been no adjudication was recently set forth in J. & J. Anderson, 767 F.2d at 1475, and contains two elements which must be satisfied. The plaintiff must demonstrate that his lawsuit is linked causally to the relief obtained, i.e. the suit must be a "substantial factor or a significant catalyst" in prompting the defendants to act or cease their behavior. He must also demonstrate that the defendant's conduct in response to the lawsuit was required by the Constitution or federal law, i.e. the defendant's actions must be legally required.[4]
 
 
 14
 The first element primarily involves a factual inquiry: whether the lawsuit caused the defendant to act. The trial court is in the best position to evaluate this issue because it has dealt with the parties and can evaluate the strengths and weaknesses of the case. If the "prevailing party" issue turns on this first element, then the appellate court should apply the clearly erroneous standard of review. The second element primarily requires legal analysis, although the facts certainly bear on the outcome. Because this second element stresses legal analysis, if the "prevailing party" issue is resolved by whether a defendant's actions are legally required, then de novo review is appropriate.
 
 IV. Discussion
 
 15
 In this case, it is evident from the Second Amended Complaint that plaintiff sought to compel the defendants to provide him with adequate health care services, a safe living environment, "appropriate classification and placement decisions," and protect his rights to privacy, "personality and existence as a transsexual in the female gender." The district court found plaintiff's lawsuit to have a "catalytic effect ... in obtaining treatment and release." The court's interim order allowing plaintiff to take low levels of female hormones was found to be the result of plaintiff's lawsuit. The court also determined that plaintiff's release was caused by the lawsuit because the hormone treatments led to the development of breast tissue which created a management problem at the prison which, in turn, led to plaintiff's release. The district court, however, did not address whether these results were required by law.
 
 
 16
 The district court's conclusion that the lawsuit is causally linked to the relief obtained is tenuous. Although plaintiff was permitted to obtain low levels of female hormones through the court's interim order, it is unclear whether that treatment would have continued as a result of judicial intervention because it was never determined whether such treatment was a serious medical necessity. The Department of Corrections amended its policy to permit hormone treatment, but such policy changes were being studied prior to plaintiff's lawsuit. Additionally, it is apparent from the record that plaintiff's management problems were not due solely to his breast development, but were caused by his repeated attempts at self-mutilation. Thus, the link between the breast development as a result of the hormone treatment required by the interim order and plaintiff's ultimate release from prison is extremely weak. Giving due deference to the district court's findings and applying the clearly erroneous standard, we are convinced that the court erred in finding a link between the lawsuit and the results obtained.
 
 
 17
 An independent review of the record also leads to the conclusion that defendant's conduct was not legally required. There can be no question that the State of Colorado was not required by law to release plaintiff from prison. We also are unable to conclude that federal law requires prison officials to administer female hormones to a transsexual inmate. The eighth amendment protects prison inmates from "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). To establish entitlement to female hormone treatment pursuant to the eighth amendment, plaintiff was required to prove that withholding such treatment would have constituted "deliberate indifference to serious medical needs." Id. It was established that some form of therapy was necessary after plaintiff's castration and he was offered testosterone replacement by Dr. Robert McGowan of the Department of Corrections. Although Dr. John Glismann, a psychiatrist, and Dr. Kathleen Graze, an endocrinologist, recommended estrogen therapy, Dr. Robert Alsever, an endocrinologist, Dr. Dennis Kleinsasser, Director of Medical Services for the Department of Corrections, and the Department of Corrections medical staff disagreed. The record reflects the controversial nature of such therapy.
 
 
 18
 It is apparent from the record that there were a variety of options available for the treatment of plaintiff's psychological and physical medical conditions. It was never established, however, that failing to treat plaintiff with estrogen would constitute deliberate indifference to a serious medical need. While the medical community may disagree among themselves as to the best form of treatment for plaintiff's condition, the Department of Corrections made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs. The medical decision not to give plaintiff estrogen until further study does not represent cruel and unusual punishment. This case, like Estelle, does not present a situation where there was a total failure to give medical attention. At most, plaintiff might have made a case for negligence or medical malpractice, but he could not have established a constitutional violation. Estelle v. Gamble, 429 U.S. at 105-06, 97 S.Ct. at 291-92; Daniels v. Galbreath, 668 F.2d 477, 482 (10th Cir.1982). See generally Davidson v. Cannon, --- U.S. ----, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Defendants' actions, therefore, were not required by the Constitution or federal law, and plaintiff cannot be considered a prevailing party within the meaning of Sec. 1988.
 
 V. Conclusion
 
 19
 Plaintiff has failed to satisfy either prong of the "prevailing party" test. The lawsuit was not causally linked to the relief obtained and, based on the record in this case, defendants' conduct was not legally required. Because plaintiff cannot be considered a prevailing party within the meaning of 42 U.S.C. Sec. 1988, he is not entitled to an award of attorney's fees.
 
 
 20
 The district court's order awarding appellee costs and attorney's fees is reversed and remanded to the district court with instructions to vacate the order.
 
 SETH, Circuit Judge, concurring:
 
 21
 I concur in the opinion by Judge Baldock, but add some emphasis on the position of this circuit expressed in two previous opinions. Thus we held in Operating Engineers Local Union No. 3 v. Bohn, 737 F.2d 860 (10th Cir.), after a reference to the "test" in Nadeau v. Helgemoe, 581 F.2d 275 (1st Cir.):
 
 
 22
 "Under this test, a plaintiff who brings an action alleging a civil rights violation, but who does not receive a judgment on the merits is still a prevailing party for section 1988 purposes if he makes two showings. First, plaintiff's lawsuit must be causally linked to the securing of the relief obtained. Second, the defendant's conduct in response to the lawsuit must be required by law. Id. at 281."
 
 
 23
 In my view, by Operating Engineers Local Union No. 3 v. Bohn, 737 F.2d 860 (10th Cir.), and by J & J Anderson, Inc. v. Town of Erie, 767 F.2d 1469 (10th Cir.), we have adopted Nadeau and both the therein described causal connection requirement and the requirement that defendants' conduct be required by law. The court in Nadeau as to the second element, said:
 
 
 24
 "Even if plaintiffs can establish that their suit was causally related to the defendants' actions which improved their condition, this is only half of their battle. The test they must pass is legal as well as factual. If it has been judicially determined that defendants' conduct, however beneficial it may be to plaintiffs' interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense."
 
 
 25
 The two elements of Nadeau were thus approved by this circuit. The term "gratuitous conduct" acquired a definition by our cases (as well as by Nadeau as an action not required by law. In J & J Anderson we held that regardless of the result of the lawsuit it must be determined whether the suit "as a matter of law, involved the vindication of rights secured to the plaintiff by the Constitution." We there quoted from Williams v. Leatherbury, 672 F.2d 549 (5th Cir.), as to the causal connection requirement and then significantly emphasized the following from Leatherbury, "and that defendant's conduct was required by law, i.e., not a wholly gratuitous response to an action that in itself was frivolous or groundless."
 
 
 26
 The emphasis in the Leatherbury quotation in J & J Anderson puts together the two requirements and the second--as required by law--not gratuitous--as an independent requirement. We have gone down the road a long way with the two requirements and, in my view, Operating Engineers and J & J Anderson have to control.
 
 
 27
 With the elements in place the plaintiff here must fail because the dispute originated as to the validity of a particular treatment requested by the plaintiff, and resisted by the prison.
 
 
 28
 It was thus like several cases wherein we have considered such disputes as to the proper medical treatment. This as a matter of law did not involve a vindication of rights secured by the Constitution.
 
 
 29
 The prison did not fully agree to the prisoner's demands but did administer some estrogen, but the medical dispute was not really resolved. The results or consequences of the estrogen, which were apparently not fully anticipated, did in any event require the release of the plaintiff from prison in that it raised the management problem to an impossible level. The release was not the relief sought by the prisoner but appears to have been the only solution. The attorney for the plaintiff performed a service to all concerned and in a professional manner, but unfortunately I see no category in which to place it other than as a pro bono service.
 
 
 30
 I so agree with the opinion by Judge Baldock.
 
 
 31
 SEYMOUR, Circuit Judge, dissenting.
 
 
 32
 I respectfully dissent. Shauna Supre may be considered a prevailing party for purposes of recovering attorneys fees: (1) if her action is causally linked to attaining some of the benefits sought in bringing suit, and (2) if her original legal claim was not unfounded.[1] Nadeau v. Helgemoe, 581 F.2d 275, 281 (1st Cir.1978). In reversing the district court's fee award, the majority has misapplied the first prong of the prevailing party test and misapprehended the second. In my view, Supre has met the test for recovery of attorneys fees.[2]
 
 
 33
 J & J Anderson, Inc. v. Town of Erie, 767 F.2d 1469 (10th Cir.1985), relied on by the majority, affirms that this circuit follows Nadeau. See id. at 1472. Although J & J Anderson suggests that a defendant's remedial conduct must be required by law, see id. at 1475, the majority has viewed this language in a vacuum. We further explained in J & J Anderson that a plaintiff need show only that the defendant's conduct was " 'not a wholly gratuitous response to an action that in itself was frivolous or groundless.' " Id. (quoting Williams v. Leatherbury, 672 F.2d 549, 551 (5th Cir.1982)). We then demonstrated that the plaintiffs there could not conceivably have prevailed. See id. at 1475-78; accord Operating Engineers Local Union No. 3 v. Bohn, 737 F.2d 860, 863 (10th Cir.1980).[3] Nadeau's formulation therefore represents the law in this circuit.
 
 
 34
 The Fifth Circuit recently clarified the Nadeau test:
 
 
 35
 "[W]e hold that a plaintiff who achieves the goal sought in a civil rights suit by voluntary action of the defendant prevails within the meaning of the Act if she demonstrates that the suit caused the defendant to act, unless the defendant proves that the plaintiff's claim had no colorable merit and the defendant made the change gratuitously for reasons unrelated to the potential merit of the suit."
 
 
 36
 Hennigan v. Ouachita Parish School Board, 749 F.2d 1148, 1149 (5th Cir.1985). An overwhelming majority of the circuits have endorsed these standards, and no court before today has held in favor of more stringent criteria. See id. at 1151-52 & n. 15 (reviewing cases). The majority in this case has warped what the Supreme Court has approved as a "generous formulation," see Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (citing Nadeau, 581 F.2d at 278-79), into a gauntlet to be run by this civil rights plaintiff.
 
 
 37
 In holding that Supre is not entitled to attorneys fees, the majority has erred in imposing its own view of the evidence regarding whether this action secured significant benefits. See Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Supre's lawsuit focused upon what constituted medically necessary treatment for gender dysphoria in her case. The district court specifically found that this action prompted the Department of Corrections (the Department) to relax its rigid treatment policy and to allow Supre estrogen therapy on a continuing basis. The court concluded that the Department would not have acted both promptly and favorably without the impetus of this vigorously prosecuted action. See rec., vol. VII, at 65-66.
 
 
 38
 The record amply supports this conclusion. Supre first requested estrogen in August 1980. After promising a response within one month, prison officials repeatedly delayed without explanation. Supre became desperate: as a male-to-female transsexual, she viewed herself as a woman trapped in a man's body. She attempted suicide once and mutilated herself several times in efforts at self-emasculation. After a final attempt resulted in the surgical removal of Supre's testicles, the Department at last addressed her year-old plea and rejected it. This delay clearly supports an inference that the Department would not unilaterally have confronted the task of developing a new treatment policy.
 
 
 39
 The district court found an additional fact significant: immediately after the court ordered a continuance of this case, the Department's panel of experts met for the first time and the Department revised its original policy. See Supre v. Ricketts, 596 F.Supp. 1532, 1534-35 (D.Colo.1984); see also United Handicap Federation v. Andre, 622 F.2d 342, 347 (8th Cir.1980) (chronology of events "an important factor" in inferring existence of causal connection). The court's order provided for individual attention to Supre's case by the panel, and strongly implied that one of her treating physicians should be included in its deliberations. The fulfillment of these conditions reinforces the likelihood of a link between Supre's lawsuit and the panel's ultimate recommendations. In light of these facts, I would defer to the district court's markedly superior position from which to assess the influence of this litigation.
 
 
 40
 The court also found that the case precipitated Supre's release, which apparently offered the only feasible alternative for needed care. Daniel Grove, who participated in making the necessary decisions, testified that Supre was released in part because the prison could not provide the medical treatment and accommodations she required. Grove also testified that Supre presented a management problem for prison officials. The district court noted that the availability of estrogen due to this lawsuit caused Supre to develop female breasts, which made her difficult to house in an all-male facility.
 
 
 41
 The majority concedes the existence of this causal connection, but asserts that Supre in fact posed a management problem because of her attempts at self-emasculation. This argument ignores the fact that the prison did not recommend parole until immediately after Supre began receiving estrogen, which was long after the most extreme incidents of self-mutilation had occurred. See Andre, 622 F.2d at 347. The district court did hear testimony supporting the majority's position, but apparently chose to discount it in light of other evidence.
 
 
 42
 Such credibility determinations are entitled to great deference on appeal, see Anderson, 105 S.Ct. at 1512-13, and the majority has offered no convincing reason for disturbing those made in this case.
 
 
 43
 "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."
 
 
 44
 Id. at 1512. In my view, the record in this case clearly supports a finding that this action has generated significant results in terms of both treatment and release.
 
 
 45
 In requiring Supre to prove that the Department's change in treatment policy was required by law, the majority has improperly converted Nadeau's modest requirement that a plaintiff's action not be unfounded into an onerous and unprecedented demand that she win her case outright. The Supreme Court has admonished that "[a] request for attorney's fees should not result in a second major litigation." Hensley, 461 U.S. at 437, 103 S.Ct. at 1941. Surely Congress did not intend that a settling plaintiff be required to prove her whole case in order to recover such fees. Nadeau established that a plaintiff should be considered the prevailing party in a case terminated without trial unless her original legal claim could be deemed frivolous, unreasonable, or groundless. See 581 F.2d at 281. In my view, the record in this case reveals a complicated fact pattern which supports a claim of "deliberate indifference to serious medical needs." See Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).
 
 
 46
 This case presents more than a straightforward professional disagreement over the proper course of treatment for gender dysphoria. The issue is decidedly not whether estrogen therapy is always required in such cases, but whether the failure to provide it under the circumstances of this case presented a nonfrivolous constitutional claim. Even assuming that the Department developed a general policy for gender dysphoria which was constitutionally adequate, prison officials nonetheless ignored a pressing medical need of Supre as an individual. She was no ordinary transsexual, but one driven to acts of self-emasculation. Prison officials put off her pleas for estrogen even though she mutilated herself repeatedly and attempted suicide. Such a failure to act raises an inference of deliberate indifference, whatever the proper course of treatment. As Dr. Graze testified, "[t]here was knowledge of several attempts at mutilation, and ... I was shocked that estrogen had not been given." Rec., vol. IV, at 111.
 
 
 47
 The Department's original treatment policy failed to respond to Supre's aberrant, self-destructive behavior, as did Dr. Alsever's conclusion that estrogen was not medically compelled in cases of gender dysphoria. As the district court summarized:
 
 
 48
 "The official response of the defendants to the mutilations, castration, doctors' diagnosis and recommendations, and plaintiff's requests for female hormones was a written policy statement dated April, 1982, which concluded that treatment for gender dysphoria and evaluation of sexual reassignment could not be provided in a penal setting."
 
 
 49
 Supre, 596 F.Supp. at 1534. Although prison officials have opined that Supre's conduct was calculated and manipulative, a charge she denies, this record contains no proof that prison physicians ever addressed whether her self-mutilation might have been symptomatic and in need of treatment. Cf. Lee v. McManus, 543 F.Supp. 386, 390-92 (D.Kan.1982) (preliminary injunction issued when physicians disagreed over necessary treatment and prison physician had ignored plaintiff's case). Perhaps the Department could have shown at trial that its medical staff did not merely promulgate a gender dysphoria treatment policy and apply it woodenly to Supre's case. On this record, however, the question remains unresolved. Supre's original claim was plainly not unfounded.
 
 
 50
 Having concluded that Supre should be considered a prevailing party, I would uphold the amount of attorneys fees awarded as reasonable in light of the results obtained, see Hensley, 461 U.S. at 435, 103 S.Ct. at 1940. As the district court suggested, plaintiff's counsel deserves every penny for rescuing his client from conditions which might well have amounted to cruel and unusual punishment.
 
 
 51
 I would affirm.
 
 
 
 [1]
 Plaintiff's name was changed from Ralph Spencer to Shauna Christine Supre in 1980. Although plaintiff considers himself to be a woman, male pronouns will be used throughout this opinion
 
 
 [2]
 This statute provides, in pertinent part, as follows: "In any action or proceeding to enforce a provision of section ... 1983 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."
 
 
 [3]
 The Supreme Court has defined that standard as follows:
 A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
 United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 [4]
 This two-part test is thoroughly explained in the concurrence. I agree completely with the analysis contained therein
 
 
 [1]
 I choose the female pronouns "she" and "her" as a matter of courtesy to Shauna Supre. The trial judge adopted this practice, and counsel for the Department of Corrections has sometimes acknowledged Supre in female terms as well
 
 
 [2]
 Notwithstanding my view of the merits, I agree with much of the analysis contained in Part III of the majority opinion. In particular, I agree that the clearly erroneous standard of review applies to mixed questions involving primarily a factual inquiry, while de novo review is appropriate when considerations of law predominate. As the majority recognizes, this distinction applies when the facts are established or admitted. A district court's findings with regard to any underlying issues of historical fact remain subject to review under the clearly erroneous standard
 
 
 [3]
 Like J & J Anderson, Bohn purports to follow Nadeau but states that a defendant's conduct must be required by law. See 737 F.2d at 863. Unlike J & J Anderson, the court provides no explanation for the apparent contradiction. Because the plaintiff's claims were patently unfounded, see id., the court's particular choice of words should be viewed as inadvertent or, alternatively, as dictum