974 F.2d 1345
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 HERITAGE MANUFACTURING & BUILDING SUPPLY, INC., Plaintiff,
Arbest Construction Company, Inc., Plaintiff-counterdefendant,
and
McAlester Plaza, Ltd., Plaintiff-counterdefendant-Appellee,
v.
ABRAHAM DEVELOPMENT COMPANY, INC.; Robert Poe, as general
partner and agent for McAlester Plaza Ltd., as
general partner and agent for McAlester
Plaza, Ltd., L.L.A.D.,
Defendants-Appellees,
Calhoun Heating & Air Conditioning Co., Inc., an Oklahoma
corporation, Defendant-Appellant,
and
McAlester Housing Authority; McNeil Mortgage Company;
Timothy Abraham; Richard Thomason; Sherwin-Williams
Corporation; Rollie Norris; Sims-Moore Lumber Company;
Ray Pewitt, doing business as P & P Construction Co., Defendants,
Doyle Armer Painting Co., Counterclaimant.
 Nos. 87-1650, 87-2138.
 United States Court of Appeals, Tenth Circuit.
 Aug. 27, 1992.
 
 Before SEYMOUR, SETH and HOLLOWAY, Circuit Judges.
 ORDER AND JUDGMENT*
 HOLLOWAY, Circuit Judge.
 
 
 1
 This litigation arises out of the financial failure of a HUD-insured project to construct an apartment complex in McAlester, Oklahoma. Several subcontractors sued the general contractor, Abraham Development Corporation, and the owners of the construction site, McAlester Plaza, Ltd., in the United States District Court for the Eastern District of Oklahoma, seeking to recover on mechanics' and materialmen's liens. As detailed below, another action in the same federal court and an action removed to that federal court from the state court are also involved in these appeals.
 
 
 2
 Judgment having been entered in the district court for the defendant general contractor and the owners on the lien claims, four issues are presented on appeal: (1) whether the general contractor received payment in full from McAlester Plaza, Ltd., under the terms of the construction contract between Abraham Development and the McAlester Plaza partnership; (2) whether the McAlester Plaza partners properly used mortgage funds raised for construction as "trust funds" within the meaning of title 42, sections 152 and 153 of the Oklahoma statutes for the payment of "lienable claims" against the project; (3) whether McAlester Plaza, Ltd., Abraham Development, and Robert C. Poe, a general partner in McAlester Plaza, Ltd., were alter egos of one another for purposes of disregarding Abraham Development as a corporate entity in order to extend personal liability on the subcontractors' lien claims to Poe; and (4) whether the defendants are entitled to recover reasonable attorney fees incurred in the defense of the subcontractors' lien claims.
 
 
 3
 * In February 1981, McAlester Plaza, Ltd., an Oklahoma limited partnership, entered into a contract with the Abraham Development Corporation, an Oklahoma corporation, under which Abraham Development agreed to serve as general contractor for the construction of an apartment building for the elderly, insured by the Department of Housing and Urban Development (HUD). The parties agreed that the construction price was not to exceed $2,785,455, and then decided shortly thereafter that the total construction price would be no more than $2,779,455.
 
 
 4
 While the project was under construction, Robert C. Poe was a 1% interest holder in, as well as the managing general partner of, McAlester Plaza, Ltd., a 50% shareholder of Abraham Development Corporation, and the chairman and sole stockholder of Poe & Associates, a firm from which Abraham Development rented office space and received consulting services. H.T. "Tim" Abraham was president and a 50% shareholder of Abraham Development.[1]
 
 
 5
 As general contractor, Abraham Development contracted with several subcontractors who provided building materials and services for the McAlester Plaza project. Among the major subcontractors were Heritage Manufacturing & Building Supply, an Arkansas corporation, Arbest Construction Company, an Arkansas corporation, Doyle Armer, an Oklahoma citizen, Calhoun Heating & Air Conditioning Company, an Oklahoma corporation, and several others.[2]
 
 
 6
 Although construction was completed on May 12, 1982, the project was plagued by difficulties and could not open for prospective tenants. There were disputes between Abraham Development and some of the subcontractors regarding the quality and acceptability of certain construction work and the applicability of contractual remedies provided for in the contracts between the general contractor and the subcontractors. The costs of the project, moreover, appear to have run several hundred thousand dollars over the contract price.
 
 
 7
 McAlester Plaza, then, was a business venture that ended in an acrimonious insolvency for Abraham Development.[3] The subcontractors, asserting various mechanics' and materialmen's lien claims against the McAlester Plaza property under title 42, section 142 of the Oklahoma statutes, initiated this litigation against Abraham Development and the McAlester Plaza partnership in order to recover payments to which, it is argued, the subcontractors are entitled for materials and/or labor provided in connection with the McAlester Plaza project.[4]
 
 II
 
 8
 In March 1982 subcontractor Heritage Manufacturing filed suit in the United States District Court for the Eastern District of Oklahoma against Abraham Development and McAlester Plaza, Ltd., for breach of contract and enforcement of its materialman's lien. Arbest Construction filed a similar action in the same court in June 1982. In July 1982 the McAlester Plaza partnership filed a suit in the state District Court in Pittsburgh County, Oklahoma, seeking the invalidation of liens held by Heritage, Arbest, and several other McAlester Plaza subcontractors asserting lien claims against the McAlester Plaza property. The state court action was removed to the United States District Court and the three cases were consolidated.
 
 
 9
 The district court heard evidence in the cases in a bench trial in March 1984. In December 1986 the district court issued findings of fact and conclusions of law.[5] The court concluded that (1) McAlester Plaza, Ltd., had paid Abraham Development in full under the terms of their construction contract; (2) "[n]either McAlester Plaza, Ltd., Abraham Development Co., nor Robert C. Poe are the alter egos of one another"; and (3) all trust fund monies borrowed for the purpose of construction and payable under the contract were "expended for appropriate construction costs incurred in the [McAlester Plaza] project's creation." I R. Doc. 54, at 10-11.[6]
 
 
 10
 Defendants filed a motion to assess attorney fees, pursuant to title 12, section 936 of the Oklahoma statutes. The request for fees of $37,042.50 and for costs of $8,295.17 was denied by the court on April 1, 1987. I R.Doc. 62. A motion for rehearing and/or to alter or amend the order denying attorney fees was denied on June 29, 1987. I R.Doc. 66.[7]
 
 
 11
 Subcontractors Heritage Manufacturing, Arbest Construction, and Calhoun Heating and Air Conditioning appeal from the district court's final judgment of March 30, 1987. Abraham Development Co., Robert C. Poe, and Tim Abraham appeal from the denial of their motion for attorney fees.
 
 III
 
 12
 Under title 42, section 143 of the Oklahoma statutes, a construction subcontractor is entitled to a lien against the property or improvements for which the subcontractor has provided materials and/or construction services.[8] It is, however, a matter of well-settled law that the subcontractor can maintain a lien claim only against the property "to the same extent as the original contractor." Okla.Stat. tit. 42, § 143 (1991); see, e.g., Gibson v. Dunham, 346 P.2d 327, 328 (Okla.1959) ("It is ... well settled that ... the property owner's obligation is limited to the price stipulated in the contract.").[9] If the owner of the property subject to the subcontractor's lien claim has paid the general contractor in full under the construction contract between the general contractor and the owner, the subcontractor has no lien claim against the owner's property under § 143.
 
 
 13
 Because the question whether Abraham Development was paid in full by the McAlester Plaza partners is one of ultimate fact, we apply the clearly erroneous standard in reviewing such factual findings of the district court. See Fed.R.Civ.P. 52(a). We conclude that the court's finding that McAlester Plaza paid Abraham Development in full is supported by the evidentiary record. The total contract price agreed upon by Abraham Development and McAlester Plaza, Ltd., was $2,779,455. The defendants introduced evidence to support the conclusion that Abraham Development was advanced at least the amount of the contract price, and that several hundred thousand dollars more was advanced directly or on behalf of the general contractor for the project by the McAlester partnership. There was, for example, testimony by Don Spink, the secretary-treasurer of Poe & Associates and a consultant to Abraham Development on the McAlester Plaza project, that McAlester Plaza, Ltd., paid approximately $3 million to Abraham Development during the construction of the apartment building. V R. 238. There was also expert testimony and a report by John D. Fisher, a certified public accountant, concluding that the total amount "paid directly to or on behalf of Abraham Development, Inc.," by the partnership was $2,945,670. Fisher Report at 3 (in Appellees' Addendum, No. 87-1650).[10]
 
 
 14
 We cannot say that the court's finding that McAlester Plaza paid Abraham Development in full according to the terms of the construction contract was clearly erroneous. Under the circumstances, then, defendants' "paid-in-full" defense was sound and the lien claims of the subcontractors brought pursuant to § 143 must fail.
 
 IV
 
 15
 The plaintiff subcontractors also seek recovery against the McAlester Plaza partnership on the theory that the partnership misused or misapplied construction "trust funds" that were to have been reserved for the payment of "lienable claims" under title 42, section 152 of the Oklahoma statutes. The relevant statutory language is:
 
 
 16
 (1) The amount payable under any building or remodeling contract shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable claims due and owing or to become due and owing by such contractors or subcontractors by reason of such building or remodeling contract.
 
 
 17
 (2) The monies received under any mortgage given for the purpose of construction or remodeling any structure shall upon receipt by the mortgagor be held as trust funds for the payment of all valid lienable claims due and owing or to become due and owing by such mortgagor by reason of such building or remodelling contract.
 
 
 18
 Okla.Stat. tit. 42, § 152(1) & (2) (1991) (emphasis added).[11]
 
 
 19
 It is uncontested in this litigation that the McAlester Plaza partnership received some mortgage funds for the purpose of construction. There is, however, considerable disagreement as to (1) the precise amount of the trust fund that was to have been set aside for the payment of lienable claims, and (2) whether or not the subcontractors have met their burden of showing "that trust funds were applied to purposes other than valid lienable claims." Sandpiper North Apartments, Ltd. v. American Nat'l Bank & Trust Co. of Shawnee, 680 P.2d 983, 992 (Okla.1984) (describing plaintiff's burden of proof for recovery under § 152); see also Bohn v. Divine, 544 P.2d 916, 920 (Okla.Ct.App.1975) (describing elements of proving claim under trust fund statutes).
 
 
 20
 Addressing the trust fund issue, the district court concluded: (1) all trust fund monies, as well as the full amount payable as construction costs under the contract, were properly "expended for appropriate construction costs incurred in the project's creation"; (2) "[p]ayments made in excess of the contract price were [neither] 'trust fund' monies nor amounts 'payable under the contract' "; and (3) the plaintiff subcontractors had not met their burden of proving by a preponderance of the evidence the misapplication of the trust funds by the McAlester Plaza partnership. I R.Doc. 54, at 11. We agree.
 
 
 21
 Because of the ambiguity of § 152(2), the precise amount of money that was to have been set aside as construction "trust funds" for the purpose of paying "lienable claims" on the McAlester Plaza project is not entirely clear.[12] Regardless of how § 152(2) is interpreted, however, it remains the plaintiffs' burden under Oklahoma law to prove that "trust funds were applied to a purpose other than payment of valid lienable claims." Sandpiper North Apartments, Ltd., 680 P.2d at 992. The subcontractors in this case failed to carry that burden to the satisfaction of the trier of fact. Indeed, in the subcontractors' appellate brief, they specifically cite the McAlester partnership's "Building Loan Agreement Cost Break-Down" to show that $2,580,051 of the construction mortgage loan from McNeill Mortgage Co. to McAlester Plaza, Ltd., was "designated for construction costs and contractor's overhead." Brief of Appellant at 26 (No. 87-1650). The defendants, for their part, introduced volumes of documentary and expert evidence including the audited "Contractor's Certificate of Actual Cost" form that was submitted to HUD to show that Abraham Development had actually expended $2,682,085 on the McAlester Plaza project as of June 28, 1982.[13]
 
 
 22
 To summarize, there is evidence tending to show that $2,580,051 of the mortgage funds borrowed for the project by McAlester Plaza was "designated for construction costs and contractor's overhead," and evidence tending to show that at least $2,682,085 was actually expended on construction, of which only $50,117 was reported as "General Overhead." Addendum of Appellees Doc. A (No. 87-1650). Viewed in the context of the record as a whole, therefore, and giving "due regard ... to the opportunity of the trial court to judge of the credibility of the witnesses," Fed.R.Civ.P. 52(a); Anderson v. Bessemer City, 470 U.S. 564, 573 (1985), we find no clear error in the district court's conclusion that the McAlester partnership did not misapply construction trust funds.
 
 V
 
 23
 The third issue presented for appellate review is the plaintiffs' argument that Abraham Development Corporation is the alter ego of Robert C. Poe and/or McAlester Plaza, Ltd., for purposes of disregarding Abraham Development as a corporate entity in order to extend liability on the subcontractors' lien claims to Poe and/or the partnership. The district court concluded that Abraham Development had conducted its affairs as a separate corporate entity, and that "[n]either McAlester Plaza, Ltd., Abraham Development Co., nor Robert C. Poe are the alter egos of one another." I R.Doc. 54, at 10. Although we uphold the conclusions of the district court on this point,[14] we note that the subcontractors' alter ego argument is mooted by our analysis of the first two appellate issues.
 
 
 24
 In order to invoke the court's power to disregard the corporate entity under the alter ego doctrine, plaintiffs must establish "such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist." 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.10, at 615 (perm. ed. rev. vol. 1990) [hereinafter Fletcher ]. However, the factual showing that the corporation is the alter ego of its owner(s) is, in itself, insufficient to justify disregard of the corporate entity; "the 'veil is pierced' only where the corporate entity is used to defeat public interests by protecting fraud, defending crime, or [for the] perpetration of other wrong." Mainord v. Sharp, 569 P.2d 546, 548 (Okla.Ct.App.1977); accord Robertson v. Roy L. Morgan, Prod. Co., 411 F.2d 1041, 1043 (10th Cir.1969) (applying Oklahoma law); see also Sautbine v. Keller, 423 P.2d 447, 451 (Okla.1966) (explaining alter ego doctrine applicable not only in instances of wrongdoing, fraud, or criminal activity but also "to protect rights of third persons and accomplish justice"); Fish v. East, 114 F.2d 177, 191 (10th Cir.1940) (seminal case stating rule and applying Colorado law).
 
 
 25
 Because "[a]n attempt to pierce the corporate veil is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action," Fletcher § 41, at 603, through the expedient of an equitable remedy, see Sautbine, 423 P.2d at 451, plaintiffs are not entitled to the remedy in the absence of an underlying "wrong." As the Supreme Court of Oklahoma has explained: "[a]lthough equity may be invoked to protect an existing right, it is unavailable to create a right where none exists." Id.
 
 
 26
 Since we affirm the district court's denial of the plaintiff subcontractors' lien claims under § 143 and § 152--the asserted underlying wrong--there is no basis for applying the equitable remedy of disregard of the corporate entity under the alter ego doctrine.
 
 VI
 
 27
 The final appellate issue is presented by defendants Abraham Development Co., Robert C. Poe and Tim Abraham. After prevailing in the district court on the three issues discussed above, these defendants moved the court to award attorney fees of $37,042.50 (and $8,295.17 in costs, an item not involved on this appeal in No. 87-2138) assessed as costs pursuant to title 12, section 936 of the Oklahoma statutes. I R.Docs. 56, 57, 59. In denying the motion for attorney fees, the district court criticized defendants for submitting time records that appeared to have included hours that may have been devoted to other cases. I R.Doc. 62. In a three-paragraph order, the court expressly "decline[d] the invitation to peruse page after page of unedited time records in order to cull a proper itemization." Id. at 2. Defendants then made a downward revision of their requested attorney fees to $30,811.25, and documented that revised figure in a motion for rehearing and/or to alter or amend the order denying their original motion. I R.Docs. 63, 64. The court denied the second motion without explanation. Id. Doc. 66.
 
 
 28
 We accord deference to a district court's underlying factual findings on an application for attorney fees, and its determination generally is subject to an abuse of discretion standard. Supre v. Ricketts, 792 F.2d 958, 961 (10th Cir.1986). Nevertheless we are persuaded that the trial judge erred by rejecting in toto the claim for attorney fees, taking into consideration the original motion, the supporting records thereto, the affidavit of counsel offering to give testimony to further explain the items covered, the motion for rehearing on fees with the $6,231.25 reduction for conceded clerical error, and the additional time records submitted with the motion for rehearing. Based on our examination in detail of the submissions, particularly the revised exhibits supporting the reduced claim for fees of $30,811.25, we feel there was error in rejecting the claim entirely. The revised exhibits, along with the earlier ones, made substantial identification and explanation of the work for which the fees were claimed and, as noted, offered to submit testimony in further explanation.
 
 
 29
 The court was not, of course, obliged to accept the original or the revised claims as submitted. Nevertheless in view of the substantial showing and the offer to justify the claim further, we are convinced it was error to reject the claim for attorney fees outright. The Oklahoma statutes are clear that the prevailing party in a lien controversy is entitled to fees. Okla.Stat. tit. 42, § 176 (1991). Moreover the prevailing party in civil actions for labor or services, on an open account, etc., may recover attorney fees. Okla.Stat. tit. 12, § 936 (1991). See Van Cleave v. Kolpak Builders Co., 693 P.2d 17, 18-19 (Okla.Ct.App.1984) (referring to § 176 to resolve party's request for attorney fees made on basis of § 936). Thus there is no dispute on the legal basis being provided by Oklahoma law for recovery of attorney fees by prevailing parties such as the appellants in No. 87-2138, a lien controversy.
 
 VII
 
 30
 Accordingly, the judgment is affirmed in all respects except as to the denial of attorney fees; the orders rejecting the claim for fees are vacated and the cases are remanded for further proceedings and disposition on the attorney fee claim.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 In October 1982, approximately five months after the McAlester Plaza project was completed, Abraham bought Poe's shares and became the sole shareholder of Abraham Development. See I R.Doc. 54, at 9 (district court's findings of fact and conclusions of law)
 
 
 [2]
 The Rule 28.2(A) certification for case number 87-1650 also lists as being or having been "involved in this case," the following additional parties: McNeill Mortgage Co., Sherwin-Williams Corp., Temple Supply, Inc., and the First National Bank & Trust Company of Oklahoma City. McNeill and First National provided some mortgage financing for the apartment building, while Sherwin-Williams and Temple Supply apparently provided building materials and/or supplies. Although none of these parties submitted briefs for this appeal, the resolution of the questions before us may affect their interests
 
 
 [3]
 It was the undisputed testimony of Tim Abraham in his deposition that Abraham Development was "insolvent," but that the corporation had not initiated formal bankruptcy proceedings. VIII R. 4-5
 
 
 [4]
 The subcontractors filed the liens with the County Clerk of Pittsburgh County, Oklahoma. See Brief of Appellant Calhoun Heating & Air Conditioning, Inc. at 4
 
 
 [5]
 Pursuant to a bifurcation order, the trial was limited to three issues:
 
 
 [1]
 Whether McAlester Plaza, Ltd., owner of the construction project at issue, has paid, in full, its contractual obligation to its general contractor, Abraham Development Co., Inc.;
 
 
 [2]
 Whether McAlester Plaza, Ltd. and Abraham Development Co., Inc. are "alter egos" of one another and/or "alter egos" of Robert C. Poe;
 
 
 [3]
 Whether McAlester Plaza, Ltd. received "trust funds" within the contemplation of 42 O.S.1981 § 152(2), and whether McAlester Plaza, Ltd. used said funds for the payment of all valid lienable claims due and owing or to become due and owing by such mortgagor by reason of the project in question
 I R.Doc. 54, at 2 (findings of fact and conclusions of law).
 
 
 [6]
 
 The Findings of Fact and Conclusions of Law were certified as a final judgment by order of the district court in March 1987. I R.Doc. 61.
 
 
 [7]
 Defendants' motion for rehearing, which was filed pursuant to Rule 59(e), included additional documentation and a revised request for attorney fees of $30,811.25. See Fed.R.Civ.P. 59(e)
 
 
 [8]
 The relevant part of the statute provides:
 Any person who shall furnish any such material or lease or rent equipment used on said land or perform such labor as a subcontractor ... may obtain a lien upon such land, or improvements, or both, from the same time, in the same manner, and to the same extent as the original contractor, for the amount due him for such material, equipment and labor.... Provided ... that the owner of any land affected by such lien shall not thereby become liable to any claimant for any greater amount than he contracted to pay the original contractor.
 Okla.Stat. tit. 42, § 143 (1991) (emphasis added).
 
 
 [9]
 See also Annotation, Building and Construction Contracts: Right of Subcontractor Who Has Dealt Only with Primary Contractor to Recover Against Property Owner in Quasi Contract, 62 A.L.R.3d 288, 293 (1975) ("it has been widely held or recognized that, apart from unjust enrichment or from any special statutory rights or remedies, a subcontractor who has furnished labor or materials for the construction or repair of some form of improvement on the lands of another has no right to a personal judgment against the landowner where there is no contractual relationship between them")
 
 
 [10]
 See also Testimony of Jimmy Doland Thomas, C.P.A., V R. 244, 261-63 (estimating that McAlester Plaza had advanced $2,846,857 to Abraham Development as of July 16, 1982, and approximately $500,000 more thereafter)
 
 
 [11]
 Also relevant is § 153, which provides in part:
 (1) The trust funds created under Section 152 of this title shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing or to become due and owing shall have been paid.
 Okla.Stat. tit. 42, § 153(1) (1991).
 
 
 [12]
 Reading § 152(2) in pari materia with § 143, it is reasonable to construe the trust fund provisions of § 152(2) as referring to the entire contract price of $2,779,455. See generally 2B Sutherland Statutory Constr. § 51.01, at 117-21 (5th ed. 1992) (explaining application of in pari materia as a canon of statutory construction). In Sandpiper North Apartments, Ltd., the Oklahoma Supreme Court explained that §§ 152 and 153 "not only safeguard the rights of lien claimants on the job but also protect an owner, contractor, subcontractor, or other beneficiary from exposure in excess of the contract limit." 680 P.2d at 987 (emphasis added). But Sandpiper North Apartments, Ltd. defines only the upper limit of the amount that can be designated as construction "trust funds"; the court does not define the lower limit
 
 
 [13]
 The $2,682,085 figure is drawn from the "Contractor's Certificate of Actual Cost" which is reproduced as page 3 of the Jenkins (C.P.A.) cost certification report of July 27, 1982. Addendum of Appellees Doc. A (No. 87-1650). The $2,682,085 includes $50,117 specifically designated as "General Overhead."
 It is the defendants' position on appeal that the net cost of construction for purposes of the trust fund statute was $2,580,051, i.e., the original contract price (before the $6,000 downward adjustment of the price) minus the contractor's fee of $205,404.08. They refer to evidence in the Clothier audit tending to show that $2,386,514 was borrowed by the McAlester Plaza partnership to pay the net cost of construction. Reply Brief of Appellees at 17 (No. 87-1650).
 
 
 [14]
 Although there was a close relationship between McAlester Plaza, Ltd., and Abraham Development, the district court found substantial factual evidence of Abraham Development's existence as a separate corporate entity. The court noted that Abraham Development:
 [M]aintained separate, although incomplete, corporate minute books.... It paid rent to Poe and Associates, Inc. [,] for its Tulsa office space, located in the same suite with Poe and Associates, Inc. It had its own checking account. It existed before the project at issue began and continues to exist after completion. It filed separate tax returns. Other entities, such as Arbest, recognized Abraham as a separate corporate entity and intended to and did contract with it as such.
 I R.Doc. 54, at 8.