Carolyn FRYMIRE, John H. Olson, Jerry Robinett, C. Dean Steppler, Michael E. Lutz, Mark J. Maccerella, Gordon McManus, David R. Berg, Richard C. Goin, Michael C. Shannon, Phyllis Martinez, James Platt, Arthur D. Wood, Jr., Frank Boerner, Diana Madsen, E. Charles Robinson, Fred Ammermann, Sharon Canales, LaJuana Bremer, Donald N. Tow, Donald R. Suit, Shirley L. Knott, Dave Ruby, Mark C. Yarns, Howell E. Shepard, Shirley S. Elliott, Robert B. Wood, James W. McWilliams, Kent G. Karper, Richard Alderman, Tom Carley, Rose Roybal, Kenneth W. Brown, Juanita B. Nichols, Bonnie Staton, Carolyn J. Newland, Robert Wallace, Daniel J. Silva, Jeannette A. Portrey, Jack Evans, Leslie Gene Ward, James F. Soule, Jr., Mary Jane Kimmel, Mitsuko Smelker, Judy Hoyle, Lauri Gloria, Art Baca, Sue M. Harrison, Randy W. Lee, Robert M. Pucci, Jr., Michael Gorham, Paul A. Hann, Jo Ann Hann, Doyle McAlister, Glen Meissner, Joanne Gianni, Paul Box, JoAnne M. Runstadler, Bobby Vanlandingham, Christopher Jacobsen, Robert

Kalkman, Jeffrey Foerster, Douglas Dow, Steven Mohr, Daniel Greenleaf, Cecilia Cordova, David Blair, Robert Salazar, Chris Caceres, on behalf of themselves and all others similarly situated, Appellees/Cross–Appellants,

v.

AMPEX CORPORATION, a California Corporation, and Ampex Systems Corporation, a Delaware Corporation and successor in interest to Ampex Corporation, Appellant/Cross–Appellee.

Nos. 94–1059, 94–1090.

United States Court of Appeals, Tenth Circuit.

July 19, 1995.

Barney Iuppa of Iuppa, Simons & Martin, Colorado Springs, CO, for appellees/cross-appellants.

Joseph A. Schwachter (John C. Fish, Jr. of Littler, Mendelson, Fastiff, Tichy & Mathiason, San Francisco, CA and Cecil R. Hedger of Harding & Ogborn, Denver, CO, with him on the brief) of Littler, Mendelson, Fastiff, Tichy & Mathiason, San Francisco, CA, for appellant/cross-appellee.

Before KELLY, BRIGHT,[*] and BARRETT, Circuit Judges.

BRIGHT, Circuit Judge.

## I. Introduction

Frymire and eighty-four other employees ("Plaintiffs") of Ampex Corporation ("Ampex") brought this action against Ampex, alleging violations of the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101–2109. The WARN Act requires large employers who are either closing a plant or instituting mass layoffs to provide sixty-days advance notice to those employees who will be laid off or who will have their hours substantially reduced. After a bench trial, the district court[1] determined that Ampex had violated the notice requirements of WARN and instituted a judgment in favor of the Plaintiffs totalling $577,728.23 in damages, post-judgment inter-

est and attorneys fees.[2] *See Frymire v. Ampex Corp.*, 858 F.Supp. 1081 (D.Colo. 1994).

Ampex raises six issues on appeal: (1) the district court abused its discretion in refusing to allow Ampex to amend its complaint to raise a statute of limitations defense, and erred as a matter of law in applying Colorado's three-year contract limitations period to Plaintiffs' WARN claim, as opposed to the National Labor Relations Act's six-month limitations period for § 10(b) claims; (2) the district court erred in its determination that the Video Systems facility and Recording Systems facility constituted two separate "single sites of employment" and thus erred in concluding that Ampex violated WARN; (3) the district court abused its discretion in not reducing Ampex's liability for its "good faith" efforts to comply with WARN's requirements; (4) the district court erred in not reducing Ampex's liability by the amount of "pay in lieu of notice" benefits distributed to each Plaintiff; (5) the district court erred as a matter of law in using "calendar days," and not "work days," in calculating the Plaintiffs' back pay damages; and (6) the district court erred in awarding Plaintiffs prejudgment interest.

In its cross-appeal, Plaintiffs contend that the district court erred in not counting thirty-one temporary employees for purposes of determining the threshold liability amount required by WARN. We do not reach this issue.

Several of the WARN issues present matters of first impression in this circuit. After careful consideration, we affirm in part, reverse in part, and remand to appropriately reduce the damages awarded against Ampex.

## II. Background

Ampex Corporation designs, engineers, manufactures and markets highly sophisticated electronic audio and video recording products. Headquartered in Redwood City, Cali-

---

[*] The Honorable Myron H. Bright, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1]. The Honorable Daniel B. Sparr, United States District Court for the District of Colorado.

[2]. The court later adjusted, without objection, the damages award to $586,762.99, and pursuant to post-trial motions, awarded the Plaintiffs prejudgment interest.

fornia, Ampex has several manufacturing plants around the country, including one in Colorado Springs, Colorado, which is the subject of this cause of action. At the Colorado Springs facility, Ampex is further divided into two separate, wholly owned subsidiaries. Ampex Recording Systems Corporation ("RSC") produces recording devices that are comparable, albeit in more highly technical form, to one's home videocassette recorder. Ampex Video Systems Corporation ("VSC") produces computer-generated animation, graphics and special effects equipment, as well as switchers and editing equipment.

Historically, the employees at the Colorado Springs campus worked in one building located at 600 Wooten Road and were part of one division within the Ampex corporate structure—the Audio/Video Systems Division. In 1988, Ampex divided the Audio/Video Systems Division into two separate divisions, and in 1989, Ampex separately incorporated them into VSC and RSC. In February 1990, Ampex moved VSC into a separate building located approximately 150 feet from the RSC building.

In many respects, the two corporations, although geographically almost contiguous, still functioned separately. First, RSC and VSC had, by and large, separate management teams. Second, the two corporations had no employees in common. And although certain employees were employed by one corporation while providing services to both corporations, their numbers were small. Finally, each corporation produced separate and distinct products which, while designed to work together and often marketed together, were nevertheless frequently sold separately and incorporated into the audio/video systems of Ampex's competitors. Despite these divisions, however, there still existed a sufficient amount of interfacing between the two corporations on both a formal and informal basis to suggest at least some unity and common design.

The events most relevant to this appeal took place in the latter part of 1990, approximately six months after Ampex housed RSC and VSC in separate buildings. On September 17, 1990, Ampex's then-President, Ron Ritchie, informed all Ampex employees that despite considerable operating improvements the company would have to eliminate a number of positions in the coming months. On November 13, 1990, Ritchie updated his employees, informing them that the company would have to eliminate approximately 350 positions by the first quarter of the year with some layoffs occurring immediately. Finally, on January 24, 1991, Ampex issued termination notices to the Plaintiffs and informed them that they would be entitled to Ampex's "pay in lieu of notice" benefits, pursuant to company policy.

Ampex's "pay in lieu of notice" policy, instituted months before WARN was enacted, provided that employees who were fired without advance notice would still receive regular wages and benefits for a period of time commensurate with each employee's length of service. Additionally, Ampex provided each of its dismissed employees two-days worth of job placement counseling, including resume assistance and job search strategizing.

Despite these benefits, dismissed employees from both the VSC and RSC facilities brought this action against Ampex, claiming they were entitled to sixty-days advance notice and, not having received such notice, sixty-days worth of back pay. Pursuant to Ampex's motion for summary judgment, the district court ruled that the two facilities constituted separate "single sites of employment" and granted Ampex summary judgment as to those Plaintiffs who were employed by RSC as not meeting WARN's threshold requirement. However, because the percentage of VSC employees laid off exceeded WARN's threshold dismissal rate, see § 2101(a)(3), the court denied Ampex's motion as to these employees/Plaintiffs. *Frymire v. Ampex Corp.*, No. 91–S–1858 (D.Colo. Sept. 14, 1992) (order). The court subsequently denied Ampex's motion for reconsideration and in an order filed February 26, 1993, granted class certification to the Plaintiffs.

This matter proceeded to trial and on January 7, 1994, the district court issued its opinion holding Ampex liable under the WARN Act and assessing damages. *See*

*Frymire v. Ampex Corp.,* 858 F.Supp. 1081 (D.Colo.1994). This appeal followed.

## III. Discussion

### A. Statute of Limitations

As an initial matter, we must determine whether Plaintiffs' cause of action is time-barred. Ampex first raised the time-bar issue in its Rule 15(a)[3] motion for leave to amend its defense. There, Ampex contended that Plaintiffs' WARN Act claim was barred under the applicable statute of limitations borrowed from § 10(b) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(b). Both parties agree that approximately nine months elapsed between the time that this cause of action accrued, January 24, 1991, and Plaintiffs filed suit, October 24, 1991. The NLRA establishes a six-month statute of limitations period and if applicable to WARN would render this suit dismissable.

After reviewing Ampex's motion, the district court refused to apply the NLRA limitations and instead determined that the three-year statute of limitations for breach of contract claims in Colorado provided a more appropriate analogy to Plaintiffs' WARN claim. *Frymire v. Ampex Corp.,* 821 F.Supp. 651, 654–55 (D.Colo.1993) (citing Colo.Rev. Stat. § 13–80–101(1)(a)). Accordingly, the court denied Ampex's Rule 15(a) motion. Ampex appeals that judgment, arguing that the district court went beyond the scope of Ampex's motion to amend by determining without adequate briefing what the applicable statute of limitations should be. Alternatively, Ampex suggests that even if the district court had the authority to rule on the merits of Ampex's time-bar defense, the court erred in not selecting the most analogous federal or state statute of limitations period. Upon review of the relevant case law, we disagree with Ampex's claims of error and affirm the district court.

■ Based on the record before this court, we believe the district court had been adequately briefed and thus had appropriately addressed the merits of Ampex's time-bar

defense. Plaintiffs addressed the issue of the applicable statute of limitations in their memorandum brief in opposition to Ampex's motion to amend. Thereafter, Ampex filed a reply brief that while disavowing the need for and the appropriateness of addressing the merits of the time-bar defense nevertheless reasserted Ampex's contention that the NLRA's statute of limitations should apply. In sum, the court's decision to rule on the substantive merits of Ampex's time-bar defense was perfectly appropriate and did not constitute an abuse of discretion.

■ This, however, does not end the analysis. We must still decide whether the district court erred as a matter of law in applying Colorado's three-year limitations period for contract actions to Plaintiffs' WARN claim. Based on the Supreme Court's recent decision in *North Star Steel Co. v. Thomas,* —— U.S. ——, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995), we conclude that the district court committed no error.

Immediately after oral argument in this appeal, there still existed an unresolved split in four circuit courts of appeals as to whether the NLRA's six-month limitations period for § 10(b) claims clearly offered a more appropriate analog for WARN causes of action than other available state limitations periods. Because the WARN Act contains no statute of limitations provision, courts had been left to borrow a myriad of periods to limit such claims. *See, e.g., United Paperworkers Int'l Union v. Specialty Paperboard, Inc.,* 999 F.2d 51 (2d Cir.1993) (applying Vermont's six-year statute of limitations for contract actions and not the NLRA's six-month statute); *United Mine Workers of America, AFL–CIO v. Peabody Coal Co.,* 38 F.3d 850 (6th Cir.1994) (applying the NLRA's limitations period for 10(b) claims), *vacated,* —— U.S. ——, 115 S.Ct. 2272, 132 L.Ed.2d 277 (1995); *Halkias v. General Dynamics Corp.,* 31 F.3d 224 (5th Cir.1994) (opting for the NLRA standard), *reh'g en banc granted* (Sept. 22, 1994). However, after this case was submitted for our deliberation, but before its filing, the Supreme Court in *Thomas*

---

**3.** Rule 15(a) of the Federal Rules of Civil Procedure provides, in relevant part, that "a party may amend the party's pleading only by leave of court

or by written consent of the adverse party; and leave shall be freely given when justice so requires."

partially resolved the statute of limitations issue, holding that a period of limitations for WARN should be borrowed from state, not federal, law.

What that decision did not decide is *which* state statute of limitations to apply. In *Thomas,* the lower appeals court had identified four statutes of limitations that could apply to WARN claims, including a four-year period for breach of implied contracts in the Commonwealth of Pennsylvania. The other three statutes provided periods of limitations spanning two to six years. Because the complaints in *Thomas* "were timely even under the shortest of these [limitations periods]," the Supreme Court elected not to decide which state limitations period to apply. *Thomas,* —— U.S. at ——, 115 S.Ct. at 1931. In this case, however, Ampex would have us apply the six-month statute of limitations period applicable to either the Colorado Labor Peace Act, Colo.Rev.Stat. § 8–3–102, or the Colorado Anti–Discrimination Act, Colo. Rev.Stat. § 24–34–401. Because Plaintiffs filed suit approximately nine months after their cause of action accrued, adoption of either of these statutes would render Plaintiffs' claim dismissable. Thus, unlike the Court in *Thomas,* we must decide which state limitations apply.[4]

Although the district court has not fully presented its reasons for borrowing a contract limitations period for WARN claims, we agree with the decision. First, borrowing a universally recognized cause of action, such as a contract action, will necessarily further the presumptively important goal of uniformity. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 357, 111 S.Ct. 2773, 2779, 115 L.Ed.2d 321 (1991); *see also Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 153, 107 S.Ct. 2759, 2765–66, 97 L.Ed.2d 121 (1987) (noting the importance of adopting a common species of state statute of limitations provisions).

Second, while employees in most states, including Colorado, are at-will employees, the WARN Act imposes a federal mandate upon employers that effectively obligates them as if bound by the terms of an employment contract. *Cf. Halkias,* 31 F.3d at 246 (Wisdom, J., dissenting) ("I view an action under WARN as essentially an action for damages caused by an alleged breach of an employer's obligation. Such an action closely resembles an action for breach of contract cognizable at common law." (internal quotation omitted)). Additionally, the WARN remedy of back pay mirrors the type of remedy afforded those who fall victim to an implied contract breach—giving individuals what they would have been entitled to had there been no breach. *Cf. id.* at 246–47.

Third and finally, other circuit judges have seen fit to apply the contract standard to WARN causes of action. *See United Paperworkers Int'l Union v. Specialty Paperboard, Inc.,* 999 F.2d 51, 57 (2d Cir.1993) (noting that while it could not "find any state substantive claim perfectly analogous to WARN," the contract statute of limitations should be applied); *Halkias,* 31 F.3d at 246 (Wisdom, J., dissenting). And, even the Supreme Court has noted that Pennsylvania's four-year limitations period for breach of an implied contract would be an acceptable state analog for WARN actions. *Thomas,* —— U.S. at ——, 115 S.Ct. at 1930–31.

For the foregoing reasons, we affirm the district court's application of Colorado's three-year contract claim limitations period to WARN and reject Ampex's contention that Plaintiffs' WARN claim is time-barred.

## B. Single Site Determination and the WARN Violation

As its second major contention on appeal, Ampex would have us conclude that its actions did not constitute a WARN violation.

To constitute a WARN violation, an employer must have ordered a plant closing or mass layoff without providing each employee, either individually or through her representatives, with sixty-days advance notice. 29 U.S.C. § 2102. A "mass layoff" refers to a reduction in force which results in an em-

---

**4.** Interestingly, even the Plaintiffs assert that the most appropriate statute of limitations period may not be the limitations period for contract claims, but rather the Colorado statute providing for a two-year limitations period for "all actions upon liability created by a federal statute where no period of limitations is provided in said federal statute." Colo.Rev.Stat. § 13–80–102(1)(g).

ployment loss at a single site of employment during any thirty-day period for fifty or more employees who comprise at least 33% of the total number of employees at that particular site. § 2101(a)(3).

■ For purposes of this appeal, the parties agree that if the VSC building constitutes a separate work location, separate and distinct from the RSC site, then the firing of ninety VSC employees without the requisite sixty-day notice violates the WARN Act.[5] Thus, the principal issue before this court is whether the district court properly determined that the VSC and RSC facilities constituted two separate sites of employment for purposes of the WARN Act.

The district court opinion refers to its disposition of this issue at various times during trial proceedings.[6] There, the court noted, among other things, that the two divisions:

appear[ed to] have several bases for being separate. They had different managers. They had different department heads. I think Mr. McWilliams' testimony was that they had different controllers, they had different quality control, engineering, operations, they had a different secretary, purchasing material. They make different products. Granted, they're the same or similar types of products, but so are the products made by Western Electric, the Mountain States Telephone Company, and AT & T, but that doesn't make them all single, individual corporations.

Appellant's Appendix, Vol. II, at 549–50 (trial transcript).

■ In reviewing the district court's determination that two separate sites of employment existed at the Ampex compound, we apply the clearly erroneous standard. Although a "single site of employment" determination is a mixed question of law and fact,

the parties concur in their assessment of the relevant legal standard and only disagree as to the facts and the interpretation of those facts in light of the legal standard. Because the district court is "better positioned" than we are to decide this primarily factual issue and because "appellate scrutiny will not contribute to the clarity" of this inherently ambiguous legal determination, we apply the more deferential standard of review. *Salve Regina College v. Russell,* 499 U.S. 225, 233, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991); *cf. Armstrong v. C.I.R.,* 15 F.3d 970, 973 (10th Cir.1994) (holding that tax court's determination that notice was mailed to petitioner's "last known address," within meaning of federal statute, was a mixed question of law and fact and subject to a clearly erroneous standard of review because the determination primarily involved a factual inquiry). *But see Carpenters Dist. Council v. Dillard Dep't Stores, Inc.,* 15 F.3d 1275, 1289 (5th Cir.1994) (holding that the "single site" determination is a mixed question of law and fact, but applying de novo review because the historical facts were largely undisputed), *cert. denied,* — U.S. —, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995).

The WARN Act does not define a "single site of employment." The rules promulgated by the Secretary of Labor, however, do provide some guidance. These provisions, in relevant part, stipulate that:

(1) A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, *may* be considered a single site of employment.

(2) There may be several single sites of employment within a single building, such as an office building, if separate employers

---

**5.** The parties disagree, however, as to whether Ampex's layoffs from both VSC and RSC would satisfy the 33% threshold level *if* the two divisions were considered one single site of employment.

In its cross-appeal, Plaintiffs contend that the district court erred in not counting thirty-one temporary employees for purposes of determining that more than 33% of all of the workers at the Colorado Springs campus had been dismissed. Because consideration of this issue is

conditioned on our reversing the district court's "single site" determination, we need not address it here.

**6.** The issue was first raised and ruled upon in Ampex's motion for summary judgment. It was re-raised and ruled upon in Ampex's motion for reconsideration. It was once again raised during the trial and ruled upon in the court's final order and judgment.

conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment.

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

20 C.F.R. § 639.3(i) (emphasis added).

■■■ Taken together, these regulations suggest that proximity and contiguity are the most important criteria for making single site determinations. They, in fact, establish whether a site will be presumed a single or multiple site. However, once a court makes the contiguous/non-contiguous determination, the operational, managerial and labor variables become the decisive factors and can defeat or reinforce the presumptions established by the proximity and contiguity factors.[7]

In the case of Ampex, the parties appear to have reached an agreement that RSC and VSC were near-contiguous buildings owned by the same employer, which, while usually constituting a single site of employment, could constitute two separate sites of employment if each building housed separate management and separate workforces and produced different products. See 20 C.F.R. § 639.3(i)(5). The disagreement between Ampex and the Plaintiffs centers, therefore, on whether the record supports the district court's determination that the VSC and RSC facilities housed separate management and labor and produced a different product. As we read the record, we believe the district court did not clearly err in its conclusion.

First, the record indicates that VSC and RSC had separate plant managers, operations managers, engineering managers, quality control managers, finance managers, human resource managers, management information systems managers, traffic managers, purchasing managers and separate plant controllers. Although, as Ampex contends, there existed some overlap and coordination of otherwise distinct managerial responsibilities (particularly with the human resource and traffic managers)[8]—and in fact some instances of common management (particularly with respect to technical and supervisory training), the district court reasonably concluded that the two corporate subsidiaries were, by and large, separately managed.

---

7. To be sure, the regulations do not characterize these "single site" factors in exclusive terms. Other factors or criteria could influence the "single site" determination, and, as some appellate decisions reveal, they have. See, e.g., International Union, UMW v. Jim Walter Resources, 6 F.3d 722, 726 (11th Cir.1993) (noting the importance of the fact that the federal government has, in other contexts, treated each site as separate and that each site uses separate facilities, such as separate parking lots); Carpenters Dist. Council v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1290 (5th Cir.1994) (noting that the creation of a separate division because of space or financial concerns weighed in favor of determining there to be one single site of employment), cert. denied, — U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995).

We, however, focus our inquiry on the management, labor and product variables, taking into consideration "other" factors only insofar as they assist our assessment of Ampex's "good faith" defense. See infra subsection III.C.

8. The record suggests, however, that even when one manager took over the responsibilities for another manager in the other building, either on a temporary or more permanent basis, the costs associated with those additional responsibilities were oftentimes, though not always, allocated between the two corporations.

Second, the fact that no employees existed in common between the two corporations strongly supports the district court's conclusion that RSC and VSC had separate and distinct workforces. Although Ampex attempts to present evidence to the contrary, such evidence taken in its larger context fails to persuade.

For example, Ampex makes much of Sharon Genberg's testimony that employees freely transferred between the two buildings without any loss of seniority or benefits. A careful review of the record indicates, however, that transfers did not occur as often as Ampex would have us believe. And even assuming transfers did occur frequently, we certainly cannot equate this phenomenon with the "shifting," "rotating" or even "sharing" of employees that presumably defines a non-"separate" workforce. 20 C.F.R. §§ 639.39(i)(3), (4), (5).

Ampex additionally contends that because some employees were employed by one division but serviced both divisions, the district court should have concluded that the two workforces were not separate, but rather overlapping. While it is certainly true that the reliability engineering, chemical waste disposal and health departments were staffed by individuals who while employed by one division serviced both, the number of "overlappers" was inconsequential. In fact, the chemical waste disposal and health departments were staffed by only one person respectively.

As to the third variable in our "single site" equation—"different products"—the record once again supports the district court's conclusion. RSC produces recording devices that are comparable to one's home videocassette recorder. VSC produces computer-generated animation, graphics and special effects equipment, as well as switchers and editing equipment. Although these products were designed to work together, are often marketed together, and even share some component parts, they are nevertheless distinct and fungible. For instance, Ampex did not design VSC's video graphics systems for exclusive use with RSC merchandise, and, in fact, Ampex's competitors often incorporated VSC graphics into their own recording sys-

tems. The fact that RSC and VSC did not necessarily have the same competitors additionally suggests that the video systems market remained independent from the recording systems market.

No bright lines exist to guide us in evaluating the district court's two single site determinations. Although the Department of Labor has provided relatively detailed standards to guide employers, employees and the courts, in close cases such as this one we cannot say with absolute certainty that one right answer exists. The district court rendered a reasonable conclusion given the close facts of this particular case. Accordingly, we will not overrule that conclusion, either as a factual matter (in that we are governed by the clearly erroneous standard) or as a legal matter (in that the statute and accompanying regulations do not require a contrary ruling).

## C. Good Faith Exception

■ Although we have decided that the district court did not err in its "single site" determination, Ampex would nevertheless have us conclude that the district court abused its discretion in not mitigating Ampex's liability. As its principal claim for reduction of damages, Ampex contends that because it had entertained a "good faith" and reasonable belief that the Colorado Springs campus constituted a "single site of employment" the district court should have reduced its liability pursuant to § 2104(a)(4) of the WARN Act.

Section 2104(a)(4) provides that:

If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

29 U.S.C. § 2104(a)(4). The few federal courts that have considered this "good faith" defense have interpreted it to require proof of the employer's subjective intent to comply with the Act, as well as evidence of objective

reasonableness in the employer's application of the Act. *Washington v. Aircap Indus., Inc.*, 860 F.Supp. 307, 315–17 (D.S.C.1994); *Oil, Chemical and Atomic Workers Int'l Union v. American Home Products Corp.*, 790 F.Supp. 1441, 1451–1452 (N.D.Ind.1992). As applied to this case, if Ampex reasonably believed that the Colorado Springs campus constituted a "single site of employment" and if it had significant evidence suggesting that it had "good faith" intentions to comply with WARN, then the district court would have erred in refusing to reduce Ampex's liability.

Ampex's conclusion that the Colorado Springs campus constituted a "single site of employment"—even if wrong—was at least "reasonable." The "single site" determination has proven to be an elusive concept. Although we agree with the district court's conclusion that the multiple work locations at the Colorado Springs campus constituted separate sites of employment, we readily acknowledge that reasonable minds could come to an entirely different conclusion. There were, in fact, no absolute, clear-cut dividing lines between VSC and RSC employees and between VSC and RSC managers, and even less of a clear division between the products they produced. And if we consider variables not outlined in the regulations but rather relied upon in other appellate decisions, Ampex's conclusions appear even more reasonable.

For example, factors such as other federal agencies treating an employer's multiple work locations as a "single site of employment," or the sharing of parking lots and cafeterias have each been deemed relevant for purposes of making a "single site" determination. *See, e.g., International Union, UMW v. Jim Walter Resources*, 6 F.3d 722, 726 (11th Cir.1993). Relying on these factors, Ampex has persuasively presented evidence that its Colorado Springs campus could reasonably have been interpreted to be a "single site of employment." At Ampex, employees interfaced daily on a formal and informal level. Employees had access to a centralized phone system and were paid through a centralized payroll system. Employees at one building had free access to the other building, shared the parking lots, cafeteria, credit union, gym and athletic fields located on the Colorado Springs campus. Moreover, in 1989, the EEOC notified Ampex that although VSC was scheduled to move into a separate building Ampex had to fill out only one EEO-1 form and develop only one affirmative action program.

When all these factors—both those outlined in the regulations and those deemed relevant in the caselaw—are considered, it is difficult to conclude that Ampex did not act at least reasonably in believing that it was complying with the requirements of WARN. And given the presumption embodied in the regulations that contiguous or near-contiguous buildings are "single sites of employment," we are additionally struck by the reasonableness of Ampex's belief that the presumption had not been defeated.

■ Of course determining that Ampex had reasonably believed that it was complying with WARN does not, standing alone, absolve Ampex of liability, let alone justify reducing its liability. Ampex must also present evidence that it had *subjectively* intended to comply with the Act. Such evidence can include proof that the employer worked with legal counsel to determine whether the company was in compliance with WARN, as well as more general evidence that the company had its employees' welfare in mind.[9] *See, e.g., Carpenters Dist. Council v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1287–1288 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995); *In re Old Electralloy Corp.*, 162 B.R. 121, 126 (Bankr.W.D.Pa.1993); *Oil, Chemical and Atomic Workers Int'l Union*, 790 F.Supp. at 1452 (emphasizing the importance of notifying the employees of impending layoffs as soon as that information is available, even if the technical notice requirements of WARN are not followed). In this case we believe that Ampex has presented sufficient and uncontroverted evidence to satisfy the subjective prong of the "good faith" test. Not only

---

**9.** The fact that the EEOC deemed the entire Colorado Springs campus to be a "single site of employment" also supports Ampex's contention that it subjectively believed it was in compliance with federal regulations.

had Sharon Genberg, Ampex's Human Resources Director, spoken extensively with corporate counsel about the single site issue, but Ampex had also instituted a "pay in lieu of notice" policy before WARN was even enacted. This policy provided dismissed employees with at least three-weeks notice or pay in lieu of notice so that they could more easily seek employment elsewhere.[10] Additionally, while Ampex did violate WARN's sixty-day notice requirement, the company had provided all of its employees, months in advance, more generalized notice that major layoffs were imminent.

In sum, we believe the district court abused its discretion in failing to reduce Ampex's liability in light of Ampex's "good faith" efforts to comply with WARN. We, of course, do not intend to suggest that all plausible interpretations of WARN will justify a "good faith" defense. Given the degree of ambiguity surrounding implementation of the WARN requirements, such an approach would certainly undermine WARN's effectiveness. Instead, we limit our holding to the particular facts of this case, where the "single site" determination was especially difficult and the evidence of subjective good intentions on the part of Ampex remained uncontroverted.

■ In reversing the district court on the "good faith" determination, we remand with instructions to reduce Ampex's liability. WARN does not specify the magnitude of reduction for a "good faith" defense and we believe that determination is better left with the district court. However, the following discussion should be carefully considered on remand.

**D. "Pay in Lieu of Notice" Setoff**

■ As the second basis for its claim that the district court erred in not reducing its liability, Ampex relies on § 2104(a)(2)(B) of the WARN Act, which provides that "[t]he amount for which an employer is liable ... shall be reduced by ... any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation." Ampex contends that because it voluntarily provided severance benefits to discharged employees its liability should be reduced by at least the amount of those benefits.

Under what became known as the "pay in lieu of notice" policy, Ampex provided that if an employee was fired with no advance notice, Ampex would still continue to pay that employee's regular wages and benefits for a period of time commensurate with his or her length of service. Although Ampex expended over one-half million dollars in "pay in lieu of notice" benefits, the district court refused to reduce Ampex's liability by this amount, concluding that the company was contractually obligated to pay those benefits under Colorado law and thus precluded from claiming the § 2104(a)(2)(B) reduction. *See Frymire v. Ampex Corp.*, 858 F.Supp. 1081, 1084 (D.Colo.1994).

■ We review the district court's decision under the clearly erroneous standard because the issue of whether the parties have entered into a contract is a question of fact under Colorado law. *Tuttle v. ANR Freight System, Inc.*, 797 P.2d 825, 827 (Colo.Ct.App. 1990); *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619, 623 (Colo.Ct.App.1988), *cert. denied* (Nov. 28, 1988); *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 536 (10th Cir.1994); *see also Salve Regina College v. Russell*, 499 U.S. 225, 233, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991).

■ Under Colorado law, an implied contract can arise out of an employment manual, handbook or any other document reflecting company policy. *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir.1994). To establish such a contract, however, employees must first show that the employer's actions manifested an intent to be bound by the provisions of that document. *Evenson v. Colorado Farm Bureau Mut. Ins. Co.*, 879 P.2d 402, 408–09 (Colo.Ct.App. 1993), *cert. denied* (Aug. 29, 1994). To estab-

---

**10.** The policy, which was fully described in Ampex's Supervisor's Manual, also provided that "[e]mployees should be given as much advance notice of layoff as possible, in order to seek other work while still employed and, if possible, avoid any period of unemployment." Appellant's Appendix, Vol. III, at 603.

lish an employer's binding intent, the terms of that offer must be communicated to all employees, *Vasey*, 29 F.3d at 1464, those terms must be sufficiently definite and detailed, *id.* at 1465; *Tuttle*, 797 P.2d at 828, and the offer must not include a disclaimer provision, *Evenson*, 879 P.2d at 409; *Redies v. Nationwide Mut. Ins. Co.*, 711 F.Supp. 570, 573 (D.Colo.1989). Once the employees establish that an offer was made, they can further establish that the offer was accepted and consideration provided by simply indicating that their continued employment with the company could at least reasonably have been motivated by the terms of the offer. *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo.1987) (en banc); *see also Tuttle*, 797 P.2d at 828 (noting how the legal significance of an employer's sexual equality policy could be grounds for continued employment with a given employer and thus constitute acceptance of that employer's offer); *Vasey*, 29 F.3d at 1465 (indicating that employees must at least have been aware of the company's "offer").

Applying these legal standards to Ampex's "pay in lieu of notice" policy, we conclude that the record sufficiently supports the district court's decision that Ampex's "pay in lieu of notice" policy constituted a binding contract.

Ampex promulgated its "pay in lieu of notice" policy applicable in this case on March 23, 1988. In an amended version of its Supervisor's Manual, Ampex included a nine-page termination policy, which among other things detailed a schedule of minimum notice and "pay in lieu of notice" procedures for employees affected by a workforce reduction. The manual included a specific schedule of benefits and employed language that strongly indicated Ampex's intention to be bound.[11] Ampex did not circulate this particular document to non-managerial employees.

In a November 28, 1989, interoffice memorandum, however, Ampex's then-president, Ron Ritchie, informed *all* Ampex employees that it had a "very generous severance policy." The memorandum then detailed the

specific terms of that policy, laid out exactly as presented in the Supervisor's Manual. Appellees' Supp. Appendix, at 93. Less than one year later, Ron Ritchie reminded all Ampex employees that the company would continue to pay wages and benefits "based on Ampex service in accordance with [its] normal policies." Appellant's Appendix, Vol. III, at 689. And when Ampex laid-off the Plaintiffs on January 24, 1991, the company once again reminded those employees that they would be given pay in lieu of notice, "in accordance with company policy 32.02." Appellant's Appendix, Vol. III, at 691.

In sum, the record sufficiently supports the district court's conclusion that Ampex had manifested the intent necessary to be bound by its "pay in lieu of notice" policy.

As for whether Ampex's employees had accepted Ampex's pay and "pay in lieu of notice" package for purposes of Colorado contract law, the record strongly indicates that they did. First, Ron Ritchie's frequent distribution of Ampex's reduction-in-force policies suggests that affected employees must have been aware of the pay and "pay in lieu of notice" package. Second, Ampex's "pay in lieu of notice" policy guaranteed its employees significant benefits, regardless of WARN's applicability, and thus could reasonably have motivated those employees to continue working with Ampex despite apparent economic difficulties with the company. In fact, Plaintiffs presented the testimony of James McWilliams, a named party Plaintiff, who indicated that he had been aware of and had personally "relied upon" Ampex's "pay in lieu of notice" policy. Appellant's Appendix, Vol. II, at 545.

In light of the record, we agree with the district court that Ampex's "pay in lieu of notice" policy constituted a binding contract and that Ampex should not benefit from a reduction in liability that is based on § 2104(a)(2)(B). Nevertheless, we believe that the amount of money expended under this "pay in lieu of notice" policy evidenced Ampex's good intentions and should have some consideration in the district court's im-

11. For example, Ampex introduced the terms of its notice/"pay in lieu of notice" policy by indicating that "[e]mployees affected by a workforce

reduction *will* be entitled...." Appellant's Appendix, Vol. III, at 602 (emphasis added).

plementation of the "good faith" reduction of liability discussed above, *see* subsection C, *supra*.[12] We remand accordingly.

### E. Calendar Days or Work Days

■ As the third basis for its claim that the district court erred in not reducing its liability, Ampex contends that the district court mistakenly used "calendar days," and not "work days," in calculating back pay damages. *See* 29 U.S.C. § 2104(a)(1). Under the district court's analysis, if an employee was denied sixty-days notice as required by WARN, he would receive his daily salary times sixty.[13] *Frymire v. Ampex Corp.*, 858 F.Supp. 1081, 1084 (D.Colo.1994). Ampex argues that the appropriate calculus requires the court to determine the number of days worked *within* the sixty-day violation period and multiply that number by the daily salary. Thus, a person who worked five days a week over a sixty-day period would have worked approximately forty-four "work days," and would be entitled to significantly less damages than that afforded by the district court.

As this is an issue of first impression for this court, we turn first to the WARN Act itself in an attempt to decipher some meaning from the statutory text. In relevant part, the WARN Act provides that:

> Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—
>
> (A) back pay for each day of violation at a rate of compensation not less than the higher of. . . .
>
> . . . .
>
> Such liability shall be calculated for the period of violation, up to a maximum of 60 days, but in no event for more than one-

half the number of days the employee was employed by the employer.

29 U.S.C. § 2104(a)(1).

Concluding that the ordinary meaning of "days" is not "work days," the district court refused to credit Ampex's contention that "days" referred to "work days" only. *Frymire*, 858 F.Supp. at 1084. Plaintiffs additionally insist that the phrase "back pay for each day of violation" necessarily includes weekends and holidays because why otherwise would Congress include the qualifying phrase "for each day of violation" and why would "liability . . . be calculated for a period of violation, up to a maximum of 60 days," if one could not use a sixty-day multiplier.

An alternative and equally plausible interpretation of these provisions suggests that an employee can receive "back pay for each day of violation," but if that employee did not work on a particular violation day, there would be no back pay to receive. Thus, an employee would receive no back pay for Saturdays and Sundays if he only worked on weekdays, but an employee who did work Saturdays and Sundays would receive back pay for those weekend days of violation. Moreover, the sentence, "liability could be calculated for a period of violation, up to a maximum of 60 days" could simply mean that we start with sixty days as a base and then subtract those days *during* the sixty-day period that the employee did not work (weekends, for example) and those days *during* the sixty-day period that the employee had notice.

Because the statute is susceptible to more than one reasonable interpretation, we would ordinarily turn to other legislative materials to ascertain Congress' intent. Our review of these materials, however, reveals that Congress' various attempts at clarification remain susceptible to the same multiple interpretations outlined above. *Compare* H.R.Conf.Rep. No. 100–576, 100th Cong., 2d

---

12. As we indicated in our "good faith" discussion, the "good faith" reduction in liability is justified by the peculiar facts of this case and thus any reduction that may be guided by (but not result from) Ampex's "pay in lieu of notice" expenditures should also be understood as peculiar to the particular facts of this case. We have no intention of, nor do we condone, using the

"good faith" exception to thwart the proscriptions detailed in other parts of the WARN Act.

13. Because both parties agreed that Ampex had voluntarily provided two-days worth of transitional employment assistance, the district court actually used 58 days as its penalty multiplier.

Sess. 1052 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 2085 (reiterating that the maximum violation period is sixty days) *with* S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987) (report on earlier draft of bill which provides that "damages are to be measured by the wages ... the employee would have received had the plant remained open or the layoff had been deferred until the conclusion of the notice period").

In sum, given the textual ambiguity, as well as the ambiguity surrounding the statute's legislative history, it is understandable that the other two circuits that have reviewed this issue have split in their determination of whether calendar or work days applies. *Compare Carpenters Dist. Council v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1282–1286 (5th Cir.1994) (applying "work days"), *cert. denied,* —— U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995), *with United Steelworkers of America v. North Star Steel Co.*, 5 F.3d 39, 41–43 (3d Cir.1993) (applying "calendar days"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994).

The various principles of statutory interpretation supporting contrary conclusions are articulated in these cases. We agree that some ambiguity exists in the statute.

■ While both opinions have merit, we adopt the views of the Fifth Circuit in *Dillard* and agree for the reasons stated therein that damage calculations based on "work days," rather than "calendar days," better reflects the statutory purpose. Accordingly,

we instruct the district court to reduce the level of liability in accordance with a "work days" calculus.[14]

## F. Prejudgment Interest

■ By post-trial motion, Plaintiffs sought and were awarded prejudgment interest on their WARN claim. *Frymire v. Ampex Corp.*, No. 91–S–1858 (D.Colo. May 26, 1994) (order). As its final argument on appeal, Ampex contests the award of prejudgment interest, claiming that WARN's "exclusive remedies" provision precludes it. *See* 29 U.S.C. § 2104(b) (stipulating that "[t]he remedies provided for in this section shall be the exclusive remedies for any violation of this chapter").

■ In reviewing the district court's award of prejudgment interest, we usually apply the abuse of discretion standard. *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994). However, when the award hinges, in part, on an interpretation of federal law, we review de novo that portion of the analysis. *Resolution Trust Corp. v. Federal Sav. & Loan Ins. Corp.*, 25 F.3d 1493, 1506 (10th Cir.1994).

■ In order to determine whether the award of prejudgment interest was appropriate under federal law, we must first determine whether the federal law in question either expressly allows or expressly forbids the inclusion of prejudgment interest. In the absence of an unequivocal prohibition of in-

---

**14.** Ampex also challenges the imposition of liability for the four Ampex employees who were notified on January 24, 1991 of their impending layoff but remained employed for more than 30 days. These four individuals were Nicholas Bacica, Paul Box, Jeffrey Foerster and Michael Lutz. The district court reduced the awards to each of these individuals by the days worked in the 60–day time period. *See Frymire v. Ampex Corp.*, 858 F.Supp. 1081, 1085–1086 (D.Colo. 1994).

Relying on 20 C.F.R. §§ 639.3(c)(1) and 639.5(a)(1)(i), Ampex contends that because a mass layoff for the purpose of WARN includes only those employees laid-off during any 30–day period the four employees who continued to work more than 30 days beyond January 24, 1991 should not be entitled to any damages. A review of these provisions indicates, however, that they refer only to the calculations used in

determining whether enough employees were laid-off so as to activate the prescriptions of WARN. *See* 29 U.S.C. § 2101(a)(3)(B). The WARN Act is silent as to whether these considerations play into determining *who* the employer is liable to.

As a policy matter, however, we do not agree with Ampex that it should not be obligated to pay these employees. If we concluded otherwise, Nicholas Bacica, Paul Box, Jeffrey Foerster and Michael Lutz would receive less compensation than they would have received had Ampex fully complied with WARN. Since we have characterized WARN as remedial in nature, *see supra* subsection III.A., these four party Plaintiffs are entitled to WARN damages, as calculated by the district court under Section 2104(a)(2)(A), which requires damages to be reduced by "any wages paid by the employer to the employee for the period of the violation."

terest, we must "test whether such interest should be included ... by appraising the 'congressional purpose in imposing the obligation in light of general principles we deem relevant.'" *United States v. Patty*, 992 F.2d 1045, 1049 (10th Cir.1993) (quoting with alteration *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 6–7, 92 L.Ed. 3 (1947)).

Here, the issue is sufficiently ambiguous to warrant our looking at the congressional purpose. Although WARN does contain an "exclusive remedies" provision, § 2104(b), WARN also contains a provision which stipulates that the very "rights and remedies provided to employees by this chapter are *in addition to,* and not in lieu of, any other contractual or *statutory rights* and remedies of the employees." § 2105 (emphasis added). Therefore, if some "other" statutorily-based right to prejudgment interest existed, § 2105 provides that WARN plaintiffs could recover prejudgment interest. Taking its cue from the language of § 2105, at least one other circuit has reasoned that 28 U.S.C. § 1961(a) is the "other" statute that guarantees civil plaintiffs in federal district court a right to prejudgment interest. *See Carpenters Dist. Council v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995).

▮ Section 1961(a) provides, among other things, that interest "shall be allowed on any money judgment in a civil case recovered in a district court." As interpreted by this court, however, § 1961(a) does not necessarily control the award of prejudgment interest in all cases, particularly where historically it has been disallowed. *Wilson v. Burlington Northern R.R. Co.*, 803 F.2d 563, 564 (10th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987). *Dillard's* decision awarding prejudgment interest under WARN is entitled to strong consideration and WARN does not precisely speak to these issues.[15] In any case, if there had been any doubts and Congress had wanted to pre-

clude the award of prejudgment interest in WARN claims, Congress could have done so expressly. That Congress did not expressly preclude such an award strongly suggests that §§ 2104(b) and 2105 can be reasonably read together as evidencing at least Congress' intent not to preclude the award of prejudgment interest in WARN actions.

As for whether Congress affirmatively envisioned prejudgment interest as an acceptable WARN remedy, we believe it did. First, the congressional purpose underlying passage of the WARN Act fully supports an award of prejudgment interest. As the court in *Dillard* analyzed the issue:

> [G]iven our holding that back pay damages essentially are wages to which employees would have received had proper notice been provided, an award of prejudgment interest furthers the congressional purpose behind the WARN Act—providing compensation to employees in lieu of proper notice such that the employees would be put in the same position as if the full sixty days notice had been provided.

15 F.3d at 1288. Second, because Congress instituted WARN for purposes of obligating employers and because Ampex's breach of that obligation has caused Plaintiffs actual monetary loss, WARN is also quintessentially the type of Act that under "historic judicial principle[s]" should bear interest. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3 (1947).

▮ That prejudgment interest *can* be given, however, only resolves part of our inquiry. We must also review for an abuse of discretion the district court's actual award of prejudgment interest. *Federal Deposit Ins. Corp. v. Rocket Oil Co.*, 865 F.2d 1158, 1160 (10th Cir.1989). Under the abuse of discretion standard, we will not disturb a trial court's decision unless that court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances. *Id.* at 1160 n. 1.

---

15. Apparently the Supreme Court has tacitly agreed that § 1961(a) does not control the award of prejudgment interest. In *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), four Justices noted that § 1961 was a postjudgment and not a

prejudgment statute and suggested that the remaining Justices on the Court agreed. *Id.* at 859, 110 S.Ct. at 1588–89 (White, J., dissenting). The Court, however, rendered this decision *after* WARN was enacted, and thus presumably ambiguity remained when Congress drafted § 2105.

In deciding whether prejudgment interest should have been awarded, we must determine whether the award of prejudgment interest served a compensatory function and reflected "fundamental considerations of fairness." *Anixter v. Home–Stake Production Co.,* 977 F.2d 1549, 1554 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1841, 1842, 123 L.Ed.2d 467 (1993); *U.S. Indus., Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1256–1257 & nn. 47–49 (10th Cir. 1988). Ampex contends that the prejudgment interest award overcompensated the Plaintiffs in light of the substantial amount of monies already received by the Plaintiffs pursuant to Ampex's "pay in lieu of notice" policy. We disagree.

As already discussed, Ampex had a separate contractual obligation to provide its employees "pay in lieu of notice" benefits. The district court predicated the award of prejudgment interest on Ampex's violation of the WARN Act, not on any infringement of Ampex's contractual obligations. Thus, in the strictest sense, Ampex's "pay in lieu of notice" benefits had no bearing on the Plaintiffs' entitlement to full compensation for Ampex's *statutory* violation. Granted, in reassessing Ampex's WARN liability we have acknowledged (and suggested that the district court consider) Ampex's payment of "pay in lieu of notice" benefits. However, because we have done so for purposes of calculating a "good faith" *reduction* of Ampex's WARN liability, we hold that preserving the award of prejudgment interest on remand properly balances the equities that have guided this opinion and certainly does not overcompensate the Plaintiffs. Accordingly, we conclude that the district court did not abuse its discretion in awarding Plaintiffs prejudgment interest.[16]

## IV. Conclusion

For the reasons presented above, we affirm the district court's opinion in part and reverse in part. We remand with instructions to reduce Ampex's liability in light of its "good faith" efforts to comply with the requirements of WARN, and to award back pay damages on the basis of "work days," and not "calendar days."

**PAUL KELLY, Jr.,** Circuit Judge, concurring in part and dissenting in part.

Le mieux est l'ennemi du bien. Voltaire, Dramatic Art.

For many of the reasons stated by the court, WARN does not apply to AMPEX's Colorado Springs operation because it is a single site lacking the requisite number of laid-off employees, therefore, I respectfully dissent. If I agreed with the court that the operations constituted two separate sites, I would concur in the results reached in parts III(A) (limitations), (C) (good faith) and part of (E) (calendar or work days), but I would dissent in Part III(D) ("pay in lieu of notice"). I would not reach Part III(F) (prejudgment interest).

WARN should not be interpreted in a vacuum. The purpose of WARN is clear—to lessen the economic impact of a plant closing or mass layoff on employees. *See* 20 C.F.R. § 639.1. It is not to be applied punitively against an employer for having to shrink its operations in order to remain viable, especially where, as in this case, the employer has taken steps in good faith to ameliorate the economic impact of such economic contraction.

### A.

Applying the law to the virtually uncontroverted evidence, Ampex's characterization of VSC and RSC as a "single site of employment" is correct. If we are dealing with a "single site of employment" the requisite number of employees were not affected by the layoff and WARN does not apply.

The court makes two legal errors in affirming the district court's determination that VSC and RSC were two single sites: (1) applying the "clearly erroneous" standard of review, and (2) treating the factors contained in the regulations narrowly, and as exclusive determinants of the "single site" inquiry.

---

**16.** The district court calculated prejudgment interest pursuant to federal law, 28 U.S.C. § 1961(a), and not as prescribed by Colorado state law. Ampex does not appeal this part of the judgment and accordingly we affirm.

The court declines to consider other factors, as other appellate courts have, which bear on the "big picture." *See* Prop. Op. at 766 n. 7. The court considers these other factors only insofar as Ampex's good faith is concerned. *Id.* This is error—the broader approach of the other circuits is correct.

The "single site of employment" determination is a mixed question of fact and law. As the Court's discussion of the legal principles underlying the applicable regulation, 29 C.F.R. § 639.3(i), makes clear, Prop. Op. at 765–766, application of the law to the established facts predominates the inquiry. Accordingly, I would review the district court's determination de novo. *See Carpenters Dist. Council v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1289 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995). *See also Supre v. Ricketts,* 792 F.2d 958, 961–62 (10th Cir.1986). Apparently, the district court regarded the issue initially as a legal inquiry—it made its determination on summary judgment on the erroneous belief that "the two corporations are separate corporations for tax purposes." Aplt. App. at 252, 278–79 (affidavit of Ampex Tax Manager that consolidated federal returns and combined state returns were filed). The district court declined to reconsider its ruling, Aplt. App. at 308, but added the rationale relied upon by this court in response to Ampex's motion for judgment on partial findings, Fed. R.Civ.P. 52(c). Aplt. App. at 547, 549–554. *See also Frymire v. Ampex,* 858 F.Supp. 1081, 1083 (D.Colo.1994) (district court adheres to its summary judgment order). The district court treatment of this issue was hardly consistent, and undermines its decision on this issue because it is not possible to tell to what degree its decision was influenced by a factual finding which was clearly erroneous. Even under a clearly erroneous standard, however, the district's court's determination on this issue should be reversed because the uncontroverted evidence on how the operation functioned requires a contrary conclusion.

RSC and VSC are near-contiguous buildings owned by AMPEX. The court acknowledges, as it must, that such an arrangement would usually constitute a single site of employment. 20 C.F.R. § 639.3(i)(1). The contiguous site factor is especially important in this case against a backdrop of Ampex's history in Colorado Springs. If the operations of Ampex had remained in the same building, no one would seriously question that a single site of employment was involved. The company's expansion to a second building 150 feet from the original building yielded no significant change in operations. On closely analogous facts, the Fifth Circuit has found a single site of employment. *See Carpenters Dist. Council,* 15 F.3d at 1290 (certain divisions moved to another site to relieve overcrowding, job functions remained closely integrated and the same as before the move; held, single site of employment). This is not a situation in which there were two separate plants or two separate mines, situations in which a finding of multiple sites of employment would be appropriate. *See International Union, UMW v. Jim Walter Resources, Inc.,* 6 F.3d 722, 726 (11th Cir.1993) (four mine sites); *United Paperworkers Local 340 v. Specialty Paperboard, Inc.,* 999 F.2d 51, 56 (2d Cir.1993) (citing H.R.Rep. No. 576, 100th Cong. 2d Sess. 1045, *reprinted in* 1988 U.S.C.C.A.N. 2078, 2079 ("For example, General Motors has dozens of automobile plants throughout the country. Each plant would be considered a site of employment....")).

Far from separate management, different products and separate workforces, which could support the conclusion of "separate sites," *see* 20 C.F.R. § 639.3(i)(5), the record reflects two divisions of one company functioning together to make complementary products, both before and after one division moved next door. In my view, this is not a case where § 639(i)(5) applies. The two divisions produced highly specialized electronic equipment, often to be sold as a system, utilizing substantial amounts of common parts. "There were, in fact, no absolute, clear-cut dividing lines between VSC and RSC employees and between VSC and RSC managers, and even less of a clear division between the products they produced." Prop. Op. at 768. Rather, there was substantial overlap between the two divisions regarding support, such as purchasing, human resources, quality control, training and engi-

neering. Several requirements were handled on behalf of both divisions with assistance from the parent corporation, such as accounting, management information systems and payroll. There was a centralized phone system, and "[e]mployees at one building had free access to the other building, shared the parking lots, cafeteria, credit union, gym and athletic fields on the Colorado Springs campus." Prop. Op. at 768. The two divisions were treated as one by the Equal Employment Opportunity Commission for purposes of compliance and affirmative action. The two divisions functioned as a single site, both before and after the move.

In its discussion on "good faith," the court acknowledges that Ampex's determination that the Colorado Springs campus was "reasonable," "that reasonable minds could come to an entirely different conclusion," that "if we consider variables not outlined in the regulations but rather relied upon in other appellate decisions, Ampex's conclusions appear even more reasonable," and that "given the presumption embodied in the regulations that contiguous or near-contiguous buildings are 'single sites of employment,' we are struck by the reasonableness that the presumption had not been defeated." Prop. Op. at 768. Ampex's characterization is not only reasonable, it is also correct.

### B.

Ampex should receive credit for its "pay in lieu of notice" provision under 29 U.S.C. § 2104(a)(2)(B). The court indicates that "Ampex promulgated its 'pay in lieu of notice' policy applicable in this case on March 23, 1988." Prop. Op. at 770. However, the record also reflects that Ampex has voluntarily continued its employees on the payroll following a layoff for at least 22 years. Aplt. App. at 494–95. This beneficence on the part of Ampex was not compelled by Congress and is not the product of any contract negotiation. Merely because employees anticipated the payments in the event of a layoff should not preclude Ampex from receiving credit. Under the court's interpretation, if an employer announced in an employee handbook that it would comply with WARN, which it must do, by providing 60 days of severance pay in lieu of notice, an additional 60 days of pay would be required because the employer had announced its legal obligation and its employees had relied upon that announcement.

To be sure, the statute requires that the payment be "voluntary and unconditional" and "not required by any legal obligation." 29 U.S.C. § 2104(a)(2)(B). But this requirement should be construed to apply to previously negotiated labor agreements or to payments bargained for between individual employees and the employer, in those situations where no blanket agreement exists. To apply the provision literally, is to punish an employer that voluntarily provided for its employees during a time of economic contraction. Ampex expended $566,012 for the very same purposes for which the trial court ordered the payment of an additional $568,-000. The court's construction of "legal obligation" will quickly result in the elimination of voluntary severance provisions that frequently confer more generous benefits on employees than those bestowed by Congress.

Of the 90 employees found eligible for WARN payments, 41 received significantly more from Ampex's voluntary "pay in lieu of notice" program than would have been required under WARN. *See* Aplt.App. at 698–700. The balance received somewhat less. I would credit any amounts received against Ampex's WARN liability on a dollar for dollar basis, by employee.

Alternatively, since the record establishes that employees receiving "pay in lieu of notice" were kept on the payroll and paid their regular wages, including benefits, for the period they qualified for, Aplt. App. at 417, I would treat these payments as wages paid to the employees during the period of violation. *See* 29 U.S.C. § 2104(a)(2)(A). The employer's liability would be reduced by the payments and thus would avoid what I consider to be a patently unfair result.

### C.

I agree with the court in part III(E) that "work days" should be the proper measure of damages under WARN. I also agree with n. 14 on page 29, to the extent it requires that

the four employees who were notified of their impending layoff on January 24, 1991, but who continued to work past 30 days, receive awards reduced by the number of days worked in the 60-day period. Section 2104(a)(2)(A) plainly requires that any damages be reduced by "any wages paid by the employer to the employee for the period of violation."